IN THE SUPREME COURT OF PENNSYLVANIA
MIDDLE DISTRICT

**CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, MCCAFFERY, STEVENS, JJ.**

| | | |
|---|---|---|
| READING AREA WATER AUTHORITY | : | No. 62 MAP 2013 |
| | : | |
| v. | : | Appeal from the Order of the |
| | : | Commonwealth Court dated 7/30/12, |
| | : | reconsideration denied 9/18/12 at No. |
| THE SCHUYLKILL RIVER GREENWAY | : | 1423 CD 2011 which |
| ASSOCIATION | : | reversed/remanded the order of Berks |
| | : | County Court of Common Pleas, Civil |
| BERN TOWNSHIP, INTERVENOR | : | Division, dated 6/30/11 at No. 10-8544 |
| | : | |
| APPEAL OF:  THE SCHUYLKILL RIVER | : | |
| GREENWAY ASSOCIATION AND BERN | : | |
| TOWNSHIP | : | ARGUED:  March 12, 2014 |


**OPINION**


**MR. JUSTICE SAYLOR**              **DECIDED:  September 24, 2014**

The primary question raised is whether a municipal authority may exercise its eminent domain powers to condemn an easement over privately-owned land, where the sole purpose of the easement is to supply a private developer with land to install sewer drainage facilities needed for a proposed private residential subdivision.

The Schuylkill River Greenway Association (the Greenway), a non-profit corporation, owns a strip of land along the west bank of the Schuylkill River in Bern Township, several miles north of the City of Reading.  The Greenway and the Township intend to build a public walking/recreational trail on this property as a segment of the larger Schuylkill River Trail.  Situated immediately to the west of the Greenway Property is a 58-acre tract owned by Fortune Development, L.P. (Developer), a private

developer. Developer seeks to construct a 219-unit adult residential subdivision, known as Water's Edge Village, on this tract.

Water's Edge Village would require access to a clean water supply as well as sanitary sewer and stormwater sewer facilities. As for clean water, a water main passing through Ontelaunee (a municipality on the east side of the Schuylkill River) can potentially connect, underneath the Schuylkill River, with a proposed water main on the west side of the river, and then continue west to Water's Edge Village. For this to occur, however, the west-side main would have to run through the Greenway's property. A similar situation exists with regard to sanitary sewer and stormwater sewer outfall, albeit the water would flow in the opposite direction. In particular, treated sewage would combine with stormwater runoff and flow eastward through the Greenway's property, ultimately discharging into the Schuylkill River. The conduits for the clean water and the sewer outfall could be laid side-by-side within a 50-foot-wide underground space on the Greenway's property, connecting the Schuylkill River and Developer's land.

The Reading Area Water Authority (RAWA), a municipal authority created by the City of Reading, supported Developer's planned development and, to that end, tried to purchase an easement across the Greenway Property so that it could supply water to the proposed development. After negotiations with the Greenway failed to produce an agreement, RAWA adopted a resolution in February 2009, authorizing the use of its eminent-domain powers to condemn a utility easement across the Greenway Property connecting Developer's land with the Schuylkill River. The resolution reflected that the easement was to be condemned at Developer's request and that it would be used for water, sewer, and stormwater purposes specifically to enable Developer to build Water's Edge Village. The resolution also stated that Developer would be responsible for initiating eminent domain proceedings in conjunction with RAWA's solicitor, and

would be required to pay all costs associated with such proceedings, including just compensation to the Greenway. The City of Reading then passed a resolution approving the RAWA resolution.[1]

In light of the City's approval, in May 2010 RAWA filed a Declaration of Taking Complaint in the Berks County common pleas court, naming the Greenway as the sole defendant and attaching an appraisal, a bond, and a description of the property to be taken. The Complaint requested a decree condemning a 50-foot-wide easement across the Greenway Property, "to construct, maintain, [and] operate utility lines and appurtenance of a water main to be placed under the Schuylkill River for water, sewer and stormwater purposes," Complaint at ¶6, reprinted in R.R. 11a, and asked that the court value the easement at $3,500 based on the appraisal.[2] According to the attached exhibits, the water main would travel west from Ontelaunee under the Schuylkill River and continue west through the Greenway Property to Developer's property. The sewer main would travel south from a sewage treatment plant on Developer's property and intersect with a pipe which would drain a stormwater retention basin (also on Developer's property). The sewer main and the stormwater pipe would then combine into a single conduit which would travel east under Developer's property, and then continue east through the Greenway Property, within the same 50-foot-wide strip of

---

[1] The City observed that such approval was necessary because RAWA must obtain the City's permission before it undertakes projects unrelated to waterworks, water supply works, or water distribution systems. See generally 53 Pa.C.S. §5607(c). In this respect, the City indicated that the proposed sanitary sewer and stormwater sewer facilities "may be viewed as a project not related to waterworks, water supply works, or water distribution systems[.]" City of Reading Resolution No. 91-2009, at 1.

[2] Although the parties disagree over the adequacy of the compensation figure, see R.R. 23a, that issue is not presently before this Court.

land, ultimately emerging through a concrete headwall and discharging the effluent onto a six-foot downward slope covered by riprap.[3]

The Greenway filed preliminary objections, alleging that: the taking was invalid under Pennsylvania's Property Rights Protection Act (PRPA),[4] because it was being accomplished solely for the benefit of private enterprise, see 26 Pa.C.S. §204(a) (generally prohibiting the use of eminent-domain powers to take private property "to use it for private enterprise"); and the proposed easement was wider than necessary to accommodate RAWA's water supply line, which the Greenway viewed as the only service legitimately within RAWA's function. RAWA answered, asserting that it had statutory authority under the Municipality Authorities Act to condemn the easement, see 53 Pa.C.S. §5607(d)(15), it had legitimate authority to accommodate sewer and stormwater facilities pursuant to the permission granted by the City, and the width of the easement was necessary to accommodate all of these facilities to serve the public. Thereafter, the Township was permitted to intervene by agreement of the parties.[5]

---

[3] Although the 50-foot-wide strip of land is subsumed within a single utility easement, approximately half of that width would be for water supply and is referred to by the parties as the "water easement," with the other half – the "drainage easement" – being used for sewer outflow. For convenience, we will use this same terminology. Notably, only the drainage easement is at issue in this case, as developed more fully below.

[4] PRPA added Chapter 2, "Limitations on Use of Eminent Domain," to the Eminent Domain Code. See Acts of May 4, 2006, P.L. 112 & 148, Nos. 34 & 35 (as amended, 26 Pa.C.S. §§201-207).

[5] Shortly before the Complaint was filed, the Greenway and the Township had executed an agreement of sale reflecting a conveyance of the Greenway Property to the Township, with settlement to occur by December 31, 2015. The agreement specified that the purpose of the conveyance was to enable the Township to construct recreational trails and related facilities for use by the public as part of the Schuylkill River Trail. On this basis, the Township alleged that it had become an equitable owner of the property, a circumstance that RAWA has never disputed.

In August 2010, the common pleas court, per President Judge Schmehl, held an evidentiary hearing at which the only witness was the Township's manager. According to his testimony, although all of the conduits – whether for water, sanitary sewer, or stormwater – would lie underground, the overall easement subsumed the surface ground as well. He observed that the development plans, and in particular the drainage portion of the easement, could interfere with the proposed trail in several ways. He testified, for example, that swales and other facilities might be created at the surface for stormwater management, and pipes would have to be excavated from time to time for repairs or replacement. Also, vegetation would need to be removed to install the headwall, grading, and riprap for the sewer discharge pipe, and especially in the summer months odors from the sewage treatment plant and sewer discharge operations would likely persist along parts of the recreational trail. Furthermore, safety fencing around the headwall could interfere with the path of the trail. See N.T., Aug. 31, 2010, at 8, 15, 19-26.[6]

The common pleas court sustained the preliminary objections and dismissed the Complaint. In its opinion, the court explained that the condemnation was effectuated solely to benefit a private commercial developer who had been unable to acquire an easement through private measures and, as such, violated the prohibition on using eminent domain for private purposes. See RAWA v. Schuylkill River Greenway Ass'n, No. 10-8544, slip op. at 6 (C.P. Berks, Oct. 27, 2011) ("Under the guise of expanding

---

[6] The witness also expressed that there was no indication that RAWA would maintain any stormwater and/or sanitary sewer facilities located within the easement. See id. at 22. In this regard, the record is not entirely clear as to who would own title to the easement. The description and map of the easement, attached to the RAWA resolution and the Complaint, and incorporated into the latter by reference, see R.R. 11a, both state that the property is to be acquired jointly by RAWA and Developer, see R.R. 18a, 21a, whereas the request for relief only mentions a transfer of title to RAWA, R.R. 12a.

their customer base and providing water to the public, RAWA is attempting to achieve its true goal and take land from one private owner and give it to another."). The court observed that the sewage and stormwater management facilities would be privately owned, and that the primary beneficiary of the condemnation would be Developer, and not the general public. See id. at 4. The court opined that the scope of the easement exceeded that which was necessary to serve any public purpose since, according to the evidence, approximately half of the fifty-foot width of the easement would be used to accommodate Developer's privately owned drainage facilities. See id. at 4-5, 8. Finally, the court expressed that the taking would not only primarily benefit a private party, it would also interfere with a portion of the Greenway's land that the Township had earmarked for a walking trail for the public to enjoy. See id. at 8.

The Commonwealth Court reversed in a published decision, focusing on RAWA's stated purpose – the installation of a water main and utility lines – for which it may exercise eminent domain. See 53 Pa.C.S. §§5607(d)(15), 5615(a)(1). The court also noted that RAWA had obtained permission, as required by its articles of incorporation, to engage in a project whose scope exceeds water supply works to include sewer services. As for the public-versus-private purpose of the taking, the court summarized PRPA and the constitutional framework together as dictating that private property may only be taken for public use. In application, the court reasoned that, although the availability of the utilities would make Developer's homes more valuable, this alone would not negate the project's public purpose of providing water, sewer, and stormwater services to citizens in RAWA's service area. Further, the court stated there was no indication whether such facilities will eventually be dedicated to RAWA. Thus, the court

concluded that RAWA properly exercised eminent domain. See Reading Area Water Auth. v. Schuylkill River Greenway Ass'n, 50 A.3d 255, 258-60 (Pa. Cmwlth. 2012).[7]

We allowed appeal to consider whether RAWA's actions were legally permissible, particularly in light of recent legislative restrictions on the use of eminent domain to benefit private enterprise. Our review "in an eminent domain case is limited to a determination of whether the trial court abused its discretion or committed an error of law, and whether the findings of fact are supported by substantial evidence." Denes v. Pa. Tpk. Comm'n, 547 Pa. 152, 156, 689 A.2d 219, 222 (1997). Thus, we consider factual findings deferentially and resolve legal issues de novo. See Pocono Manor Investors v. Gaming Control Bd., 592 Pa. 625, 637, 927 A.2d 209, 216 (2007).

Appellants (the Greenway and the Township) argue generally that the power of eminent domain may only be exercised for a public purpose. They do not challenge the water easement, opting to focus their advocacy on the drainage easement. Appellants observe that this portion of the condemned land exceeds that which is necessary for RAWA's proposed water-supply line. In this respect, they note that RAWA only operates a water-supply system, whereas it condemned an easement large enough to include extensive wastewater outflow facilities – including a pipe, a headwall, grading, and riprap – connected to a private sewage treatment plant and stormwater retention basin on Developer's land. They contend, more particularly, that RAWA may not condemn more land than it needs for water supply solely to enable a private developer to discharge its private sewage and stormwater runoff through a privately built and maintained facility over the land of another. Thus Appellants adopt the position that the drainage easement is being taken for the private use of Developer and, as such, it is not

---

[7] Senior Judge Colins noted his dissent but did not file an opinion.

authorized by the Pennsylvania Constitution or the Eminent Domain Code, and is affirmatively prohibited by PRPA. See Brief for Appellants at 12.

Appellants acknowledge that a "taking does not lose its public character merely because there may exist in the operation some feature of private gain." Appeal of Washington Park, Inc., 425 Pa. 349, 353, 229 A.2d 1, 3 (1967). They proffer, however, that, for the taking to be valid, the public must be the primary and paramount beneficiary, and the public entity involved must assume ownership and maintenance of the condemned lands and any improvements installed thereon. See Ormsby Land Co. v. City of Pittsburgh, 276 Pa. 68, 70, 119 A. 730, 730 (Pa. 1923) (holding that land dedicated for a public street may not be leased to a private entity for private use). Appellants assert that RAWA will not assume ownership and maintenance of the drainage easement or its improvements because any such dedication of these facilities to RAWA would exceed RAWA's articles of incorporation and the City's authorizing resolution. Appellants argue, therefore, that that Developer will own and operate the sewer facilities, and state that this conclusion is supported by: (a) the limited nature of the City's resolution, in which the City authorized RAWA to condemn an easement large enough merely to "accommodate" sewage and stormwater facilities owned by others (in addition to RAWA-owned water lines), City Resolution at 1, reprinted in R.R. 35a, but not to construct, operate, or maintain such facilities; (b) RAWA's own resolution, which expresses an intention "to provide a utility easement to [Developer]," RAWA Resolution at 1, reprinted in R.R. 15a; (c) RAWA's failure to present any evidence to the contrary before the common pleas court; and (d) the fact that under Pennsylvania's Storm Water Management Act, 32 P.S. §§680.1-680.17 (SWMA), as well as the associated Department of Environmental Protection regulations, Developer is alone responsible to design, construct, and operate stormwater maintenance facilities, see 32 P.S. §680.13

(assigning such responsibility to the person who alters or develops the land); 25 Pa. Code §102.5(a) (same, in relevant part). Thus, Appellants argue the Commonwealth Court misconstrued the record when it held there was no evidence concerning whether the drainage facilities will ultimately be owned by RAWA.

For its part, RAWA also references the principle, recited in Washington Park and elsewhere, that an incidental benefit to a private party does not in itself undermine the public character of a taking. RAWA observes that, in Washington Park, the government condemned land for a highway exit ramp which would benefit a shopping center and that such private benefit was not deemed to have undermined the validity of the taking. RAWA additionally references Appeal of Heim, 151 Pa. Cmwlth. 438, 617 A.2d 74 (1992), in which the intermediate court held that, even where a developer pays for the condemnation, including associated legal fees, the ancillary benefit realized by the developer does not vitiate the public nature of the condemnation so long as the condemnation is accomplished for a public purpose (in Heim, the construction of a road to a subdivision). To the contrary, RAWA emphasizes, this arrangement was expressly approved in Heim because it saved taxpayer money by shifting costs onto the developer. See id. at 447, 617 A.2d at 79. RAWA states that, as in Washington Park and Heim, the benefit conferred upon Developer in this case is ancillary and cannot taint the inherently public nature of the proposed project and corresponding condemnation – and that, as in Heim, any payment by Developer of the costs of the taking, including legal fees as well as compensation to the landowner, does not alter this conclusion since, again, it simply saves taxpayer funds.

More generally, RAWA proffers that there is a public interest in ensuring that homes have running water and access to a sewer line, and that the taking advances this interest regardless of whether Developer will benefit from the availability of such

services through its ability to build and sell fully-functioning homes. So long as there is no evidence of corruption, fraud, or malfeasance by the condemnor, RAWA argues, a condemnation for a public purpose should be upheld. Further, anticipating the counter-point that there is no present need for water and sewer services because the homes do not yet exist (and indeed, may never exist if the taking does not occur), RAWA points out that a similar circumstance arose in Washington Park and that this Court answered what it termed the "chicken and egg" problem by recognizing that government officials must look to the future and anticipate the community's needs. See Washington Park, 425 Pa. at 354-55, 229 A.2d at 4.[8]

Eminent domain is a power vested in the Commonwealth to take private property for public use upon payment of just compensation. See Phila. Clay Co. v. York Clay Co., 241 Pa. 305, 310, 88 A. 487, 488 (1913). See generally Lance's Appeal, 55 Pa. (5 Smith) 16, 25, 1867 WL 7489, *7 (1867) ("[A] public interest must lie at the basis of the exercise, or it would be confiscation and usurpation to exercise it."). Land may be taken only to the extent reasonably required by the public purpose for which the power is exercised, else it will be overturned as excessive. See Belovsky v. Redev. Auth. of City of Phila., 357 Pa. 329, 341, 54 A.2d 277, 283 (1947); Middletown Twp. v. Lands of Stone, 595 Pa. 607, 618, 939 A.2d 331, 338 (2007); Winger v. Aires, 371 Pa. 242, 247-48, 89 A.2d 521, 523-24 (1952) (invalidating a taking of land for a public school where the number of acres condemned substantially exceeded what was needed). Although

---

[8] RAWA does not offer any argument addressing PRPA or the provisions of SWMA and the DEP regulations referred to by Appellants. As to PRPA in particular, RAWA also did not discuss the statute in its brief to the Commonwealth Court, see Brief for Appellant in Reading Area Water Auth. v. Schuylkill River Greenway Ass'n, 50 A.3d 255 (Pa. Cmwlth. 2012), 2012 WL 10028724, notwithstanding that the preliminary objections and the common pleas court's opinion both referenced it. See RAWA, No. 10-8544, slip op. at 4, 9; Greenway's Preliminary Objections at 3, reprinted in R.R. 32a.

the power is an inherent attribute of sovereignty, see Phila. Clay, 241 Pa. at 309, 88 A. at 487, it is regulated by constitutional and statutory law, see Keys v. Uniontown Radial St. Ry. Co., 236 Pa. 611, 615, 84 A. 1109, 1110 (1912); Jacobs v. Clearview Water Supply Co., 220 Pa. 388, 393, 69 A. 870, 871 (1908); Appeal of Interstate Cemetery Co., 422 Pa. 594, 596, 222 A.2d 906, 908 (1966),[9] and thus, it can only be exercised within the limitations established by law. See Nw. Lehigh Sch. Dist. v. Agric. Lands Condemnation Approval Bd., 126 Pa. Cmwlth. 325, 329, 559 A.2d 978, 980 (1989) (citing, inter alia, Interstate Cemetery, 422 Pa. at 596, 222 A.2d at 908). The Commonwealth may exercise the power of eminent domain directly or indirectly by delegating it. See generally Commonwealth v. Susquehanna Area Regional Airport Auth., 423 F. Supp. 2d 472, 483 (M.D. Pa. 2006); 6 SUMM. PA. JUR. 2D Property §11:8. Because eminent domain is in derogation of private rights, any legislative authority for its use must be strictly construed in favor of the landowner. See 1 Pa.C.S. §1928(b)(4); In re Pittsburgh Sch. Dist., 430 Pa. 566, 570, 244 A.2d 42, 44 (1968); Lazarus v. Morris, 212 Pa. 128, 131, 61 A. 815, 816 (1905); see also Lands of Stone, 595 Pa. at 616, 939 A.2d at 337 (quoting Winger, 371 Pa. at 247, 89 A.2d at 523).

RAWA is authorized, as a municipal authority, to exercise the power of eminent domain, see 53 Pa.C.S. §§5615(a)(1), 5607(d)(15), and it may do so as necessary to provide the public with water via a water distribution system. See id. §5607(a)(10). Although municipal authorities may also be created for purposes relating to sewer systems and stormwater management systems, see id. §5607(a)(5), (18), it is less clear

---

[9] See PA. CONST. art. I, §10 ("[N]or shall private property be taken or applied to public use, without authority of law and without just compensation being first made or secured."); U.S. CONST. amend. V ("[N]or shall private property be taken for public use, without just compensation."). The Fifth Amendment's Takings Clause applies to the states through the Fourteenth Amendment. See Phillips v. Wash. Legal Found., 524 U.S. 156, 163-64, 118 S. Ct. 1925, 1930 (1998).

that a water authority such as RAWA may extend its operations to engage in such activities or provide these services to the public. Regardless, and as emphasized by Appellants, RAWA did not purport to condemn the drainage easement so that it could, itself, undertake those activities. Rather, the record vindicates Appellants' core assertion that RAWA only sought to provide a utility easement to Developer, see RAWA Resolution at 1, reprinted in R.R. 15a, and the City only authorized RAWA to condemn an easement of "sufficient size to accommodate" Developer's drainage facilities. City Resolution at 1, reprinted in R.R. 35a. As explained, however, any such exercise is subject to the limitations imposed by the Constitution and by statutory law – such as the Eminent Domain Code, which sets forth the law and procedure governing the condemnation of property in Pennsylvania, see 26 Pa.C.S. §102(a),[10] and includes PRPA. See supra note 4.

Our resolution of this appeal will ultimately be based on PRPA. See Wertz v. Chapman Twp., 559 Pa. 630, 633, 741 A.2d 1272, 1274 (1999) (observing it is preferable to resolve disputes on a non-constitutional basis if reasonably possible). However, a review of salient constitutional principles as they apply here is helpful to provide context, particularly in terms of whether the taking is for a public use. The public-use issue is especially relevant because it dovetails to some extent with whether the taking is being accomplished for private enterprise as prohibited by PRPA – although, as will be seen, the correspondence is not exact.

Under the Constitution, land may only be taken without the owner's consent if it is taken for a public use. The question of what constitutes a public use is highly fact-

---

[10] The current Eminent Domain Code constitutes a replacement and codification of the former Eminent Code of 1964. See Act of May 4, 2006, P.L. 112, No. 34, §1 (as amended, 26 Pa.C.S. §§101-1106) (repealing and replacing the Act of June 22, 1964, Special Sess., P.L. 84 (as amended 26 P.S. §§1-101–1-903)).

dependent.  See Dornan v. Phila. Hous. Auth., 331 Pa. 209, 221, 200 A. 834, 840 (1938); Phila. Clay Co., 241 Pa. at 311, 88 A. at 488.  Although RAWA relies heavily on Washington Park, we do not find that decision to be particularly helpful to its position.  In Washington Park, a private shopping center known as Southgate stood to benefit from the proposed highway exit ramp, and thus, was willing to pay the costs of condemnation.  Still, there was no suggestion that the ramp was intended to be owned, co-owned, occupied, or maintained by Southgate, or that its sole purpose was to provide access to Southgate.  See Washington Park, 425 Pa. at 354 n.6, 229 A.2d at 4 n.6 (reciting other public benefits of the exit ramp, including enhanced roadway safety).  Here, the record reflects that Developer would not only finance the project, but would acquire exclusive use of the drainage easement to install, operate, and maintain private stormwater and sewage discharge facilities so as to enable it to build a private residential development.  Accord RAWA, No. 10-8544, slip op. at 5 (finding that "this is a [Developer] financed project to enable [Developer] to acquire land that it could not acquire directly from the Greenway by condemnation"); cf. Lands of Stone, 595 Pa. at 619, 939 A.2d at 339 ("To condemn the land so that Mr. Stone could commercially farm it, thereby reaping a profit from land owned and maintained by the Township, serves a purely private, and thus, unconstitutional interest.").

Nevertheless, the present case has added complexion because the drainage easement is to be located side-by-side with the water easement, giving the appearance that the two work in tandem.  There is also a natural tendency to regard the two functions as intertwined, at least insofar as the sanitary sewer outfall is concerned, since most of the water that enters a residence ultimately leaves the home through its sewer connection.  This lends a certain appeal to the concept that the drainage easement is for a public use – particularly as municipal sewer and drainage systems

generally constitute a public use. Furthermore, the drainage easement would, according to Developer's plans, ultimately serve 219 homes in an adult-community residential development. This factor also tends to support the view that the drainage easement is intended for at least a limited public use vis-à-vis the prospective purchasers of the residences, regardless of the identity of the party that constructs, owns, and operates the sewer discharge facilities.

The main difficulty, however, is that there is also a significant private overlay to the taking of the drainage easement: it is, as noted, to be acquired at Developer's behest for the sole use of Developer, and at Developer's sole cost. As well, there is no suggestion that the drainage easement is meant to be used for any purpose broader than servicing the subdivision to be built by Developer. Overall, then, the case involves a mix of public and private purposes working in conjunction with one another. With this in mind, a brief discussion of Kelo v. City of New London, Connecticut, 545 U.S. 469, 125 S. Ct. 2655 (2005), its present application, and its legislative aftermath, will be helpful.

At issue in Kelo was the taking of private property for economic development and use, inter alia, by private commercial interests. The controversy dealt with a city's wide-ranging development project intended "to revitalize the local economy by creating temporary and permanent jobs, generating a significant increase in tax revenue, encouraging spin-off economic activities and maximizing public access to the waterfront[.]" Id. at 478 n.6, 125 S. Ct. at 2661 n.6 (internal quotation marks and citation omitted). Kelo was a 5-4 decision in which the majority found that economic development can qualify as a public use for Fifth Amendment purposes even where private enterprise is the engine of such development, and accorded deference to the city's governing body's determination that, although the properties to be taken were not

blighted, they were sufficiently distressed that economic rejuvenation of the overall area was in the public interest.  See Kelo, 545 U.S. at 483, 125 S. Ct. at 2664-65.

In dissent, Justice O'Connor criticized this level of deference and admonished that, "were the political branches the sole arbiters of the public-private distinction, the Public Use Clause would amount to little more than hortatory fluff."  Id. at 497, 125 S. Ct. at 2673 (O'Connor, J., dissenting).  She also expressed that the decision would have a disproportionate impact on the poor, as its beneficiaries would be citizens with substantial influence in the political process, including large corporations and development firms.  See id. at 505, 125 S. Ct. at 2677.[11]

The present case is distinguishable from Kelo in several respects.  First, consistent with the trial court's findings, the taking here has as at least one of its purposes the conferral of a private benefit on a particular, identifiable private party (Developer).  Cf. id. at 477, 125 S. Ct. at 2661 ("[T]he City would no doubt be forbidden from taking petitioners' land for the purpose of conferring a private benefit on a particular private party."); Washington Park, 425 Pa. at 353, 229 A.2d at 3 (clarifying that "the power of eminent domain may not be employed 'for the mere purpose of

---

[11] The Kelo decision generated earnest commentary in many quarters.  Compare, e.g., Ashley J. Fuhrmeister, Note, In the Name of Economic Development:  Reviving "Public Use" as a Limitation on the Eminent Domain Power in the Wake of Kelo v. City of New London, 54 DRAKE L. REV. 171, 231 (2005) (contending that Kelo stretched the concept of public use beyond its intended meaning), with John H. Brechin, In Defense of Kelo: One Lawyer's Take on Takings, 93 ILL. B.J. 524, 525 (2005) (warning against overreactions which would unnecessarily limit the government's ability to act in situations where advancement of the public good would significantly outweigh any private harm).  See generally Eric Rutkow, Kelo v. City of New London, 30 HARV. ENVTL. L. REV. 261, 279 (2006) ("By shying away from . . . crafting a higher standard of review for economic development takings that could balance the competing needs of interested parties, the Supreme Court has left homeowners in a state of uncertainty as legislatures and state courts consider the proper meaning of 'public use.'").  Kelo also led to legislative responses in jurisdictions across the nation.  See infra note 14.

devoting it to the private use of another, even though there be involved in the transaction an incidental benefit to the public'" (quoting Belovsky, 357 Pa. at 340, 54 A.2d at 282)). Relatedly, there is no evidence of an overall economic development or urban revitalization plan into which this taking fits – above and beyond Developer's own plan for its 58-acre tract.

On the other hand, the scope of the challenged taking is comparatively narrow and, as noted, involves sewer services, which is a more traditional category of public use than the multifaceted, large-scale economic development project at issue in Kelo. See Matter of Twp. of Upper St. Clair, 138 Pa. Cmwlth. 321, 323-24, 587 A.2d 907, 908-09 (1991) (observing that sewer service is generally a public use); Town of Steilacoom v. Thompson, 419 P.2d 989, 992 (Wash. 1966) (same). See generally Washington Park, 425 Pa. at 353, 229 A.2d at 3 (noting that a taking does not lose its public character merely because of an incidental private benefit, so long as the public good is enhanced). It can reasonably be argued, then, that whether the taking presently in issue is "primarily" for a public use or a private benefit is a matter of perspective. Cf. City of Knoxville v. Heth, 210 S.W.2d 326, 329 (Tenn. 1948) (indicating that when public and private benefits "are thus so blended," it is "difficult . . . to observe the line of demarcation" between the two (quoting Nichols. v. Cent. Va. Power Co., 130 S.E. 764, 767 (Va. 1926))).

Ultimately, however, we need not decide the constitutional issue because, even if we assume the condemnation can pass Fifth-Amendment scrutiny,[12] to be valid it must also be statutorily permissible. In this regard, it may be observed that, in the wake of Kelo, the General Assembly enacted PRPA, which contains a salient, affirmative

---

[12] No separate analysis has been advanced in this case to argue that Article I, Section 10 is more restrictive than the federal Takings Clause as interpreted in Kelo.

prohibition on the taking of private property "in order to use it for private enterprise." 26 Pa.C.S. §204(a).[13] See generally Anthony B. Seitz, Comment, The Property Rights Protection Act: An Overview of Pennsylvania's Response to Kelo v. City of New London, 18 WIDENER L.J. 205 (2008).[14]

It is possible that a condemnation which satisfies the Constitution's Public Use Clause may also be accomplished so that the property can be used for private enterprise. Kelo provides a ready example, as in that case the Supreme Court determined that the taking was for a public use although much of the condemned land was to be used for private enterprise. See Kelo, 545 U.S. at 473-74, 125 S. Ct. at 2659 (describing uses for the condemned property under the city's plan, including conference hotel space, retail shopping, a commercial-use marina, and a research and development facility for a pharmaceutical company). Here, the Commonwealth Court conflated the public use prerequisite with the scope of Section 204(a)'s prohibition, see RAWA, 50 A.3d at 259, and then compounded the error by concentrating solely on the

---

[13] PRPA contains several exceptions to this prohibition, such as where the property is transferred to a common carrier, is used for incidental commercial activities such as a gift shop in a government building, or where the condemnation is necessary to eliminate "blight" as narrowly defined by PRPA. See 26 Pa.C.S. §§204(b), 205. One of these exceptions pertains to condemnations by a public utility, which is discussed below.

[14] Besides Pennsylvania, numerous other jurisdictions reacted to Kelo by passing similar legislation with the result that the decision may have led to an overall diminution in takings authority nationwide. See Gregory J. Robinson, Kelo v. City of New London: Its Ironic Impact on Takings Authority, 44 URB. LAW. 865, 906 (2012) (concluding that "Kelo has had the ironic effect of setting in motion an overall policy response that, by now, has reduced economic development takings authority below its pre-Kelo level"); Amanda W. Goodin, Rejecting the Return to Blight in Post-Kelo State Legislation, 82 N.Y.U. L. REV. 177, 193-94 (2007) (observing that Kelo "provoked fierce public opposition" and that dozens of states reacted by amending their eminent domain laws).

constitutional question of public use without assessing whether Section 204(a) provides additional protections.

Notably, PRPA was passed as a direct reaction to Kelo to curb what legislators perceived as eminent domain abuse, and with the goal of striking a reasonable balance between (a) the need to defend private property rights from takings accomplished for economic development purposes, and (b) the legitimate needs of urban centers to rehabilitate blighted areas imposing substantial, concrete harm upon the public. See, e.g., House Legislative Journal, Nov. 1, 2005, at 2169-72; Senate Legislative Journal, April 25, 2006, at 1552. Whether or not the Constitution viewed as merely "ancillary" the benefits to private enterprise ensuing from a plan to use eminent domain to assist in economic development, in the wake of Kelo the Legislature began to view such benefits as central and wanted to curtail the ability of condemnors to take others' property for such purposes. Against this backdrop, the legislative body elected to phrase the central prohibition broadly in terms of whether the subject property is being condemned "to use it for private enterprise," 26 Pa.C.S. §204(a), rather than "to use it solely for private enterprise" – the latter of which, in any event, would have had little effect on the status quo since any condemnation accomplished solely for private purposes would likely have failed the constitutional public-use standard.

This observation has particular relevance to the present matter because, in spite of the drainage easement's colorable public-use facet as outlined above, RAWA condemned it, in effect, to allow Developer to occupy and use it for private enterprise – namely, to develop a residential subdivision. See RAWA, No. 10-8544, slip op. at 6 (finding that RAWA's condemnation of the drainage easement is designed to enable installation of private utilities to enable private development of Water's Edge Village). We therefore conclude that the condemnation of the drainage easement falls within

Section 204(a)'s prohibitive scope. Whatever public benefit may ensue from the drainage easement, it is being taken to be used for private enterprise and, as such, is prohibited by Section 204(a).[15]

While this determination may seem to interfere with the ability of municipal water and/or sewer authorities to expand their operations under circumstances where, as here, there is an overarching nexus between the taking and private development, it is not this Court's function to ameliorate such difficulties by departing from the statutory text. In fact, it appears that the Legislature was well aware of such a possible outcome because it expressly carved out from Section 204(a)'s ambit an exception for takings by regulated public utilities as defined in the Public Utility Code, see 66 Pa.C.S. §102, including water and sewer companies. See 26 Pa.C.S. §204(b)(2)(i). Notably, however, as a municipal authority RAWA is not a public utility under the Public Utility Code. See Chester Water Auth. v. PUC, 581 Pa. 640, 645 n.7, 868 A.2d 384, 387 n.7 (2005); accord In re Condemnation of Springboro Area Water Auth., 898 A.2d 6, 11 (Pa. Cmwlth. 2006). Therefore, the Section 204(b)(2)(i) exception does not presently apply. The Legislature's decision to exempt regulated public utilities, but not municipal authorities, from the preclusive rule set forth in Section 204(a) demonstrates that it intended to allow – within constitutional limitations – the continued use of eminent domain for the provision of public services such as water and sewer access in tandem with private development for a limited, defined class of condemnors. As RAWA is not within that class, its condemnation of the drainage easement is in violation of PRPA.

Accordingly, the order of the Commonwealth Court is reversed, and the matter is remanded to the common pleas court for reinstatement of its order sustaining the

---

[15] The presence of a public benefit, even a significant one, cannot save what is otherwise an improper condemnation. See Pa. Mut. Life Ins. Co. v. City of Phila., 242 Pa. 47, 53, 88 A. 904, 906-07 (1913).

preliminary objections and dismissing the Complaint. Although the water easement has not been challenged, the size of the condemned property – the overall utility easement – is in excess of that which is needed for water supply. Hence, RAWA is not entitled to the relief sought in its Complaint. See Winger, 371 Pa. at 248, 89 A.2d at 524 (enjoining a condemnation accomplished for a public use where the size of the condemned property exceeded what was reasonably necessary for such use).

Mr. Chief Justice Castille, Messrs. Justice Eakin and Baer, Madame Justice Todd and Messrs. Justice McCaffery and Stevens join the opinion.