IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Peters Township, a PA Municipality   :
  :
        v.   :
  :
Jason H. Snyder and Sherri L. Snyder,   :
Husband and Wife,   :   No. 45 C.D. 2023
           Appellants   :   Argued: October 10, 2023

BEFORE:   HONORABLE ANNE E. COVEY, Judge
              HONORABLE LORI A. DUMAS, Judge
              HONORABLE MARY HANNAH LEAVITT, Senior Judge

OPINION BY
JUDGE COVEY                          FILED: November 8, 2023

      Jason H. Snyder (Jason Snyder) and Sherri L. Snyder (collectively, the Snyders) appeal from the Washington County Common Pleas Court's (trial court) December 14, 2022 order dismissing the Snyders' preliminary objections (Preliminary Objections) to Peters Township's (Township) Declaration of Taking (Declaration). The Snyders present three issues for this Court's review: (1) whether the trial court erred by failing to conclude that the Township's proposed taking was for a prohibited, private purpose; (2) whether the trial court erred by failing to find that the Township required a community's property developer to provide a connecting road to an existing development despite the fact that the Township's Subdivision and Land Development Ordinance does not require such connection; and (3) whether the trial court erred by failing to conclude that the Township's Council (Council) was barred by *res judicata* when it approved the condemnation approximately three months after voting against it. After review, this Court affirms.

      The Snyders own property located at 3112 Manor Way, Washington County, Pennsylvania (Property), in a planned development called the Beacon

Manor Acres Plan (BMAP). The Township is a Home Rule Municipality organized and existing pursuant to the Home Rule Charter and Optional Plans Law, 53 Pa.C.S. §§ 2901-2984.[1] On August 9, 2021, the Council approved Ordinance No. 867[2] (Ordinance) authorizing the acquisition of a portion of the Snyders' Property to connect an existing private road on the Property with a new planned development by Rywood, LLC (Rywood), called the Juniper Woods Plan (JWP).[3] *See* Reproduced Record (R.R.) at 14a-18a.

In May 2021, the Council held a meeting during which it discussed the JWP's final approval, and the Council rejected the connecting road between the BMAP and the JWP. Notwithstanding, at an August 9, 2021 meeting, the Council reconsidered the issue and reversed its prior decision, thereby approving the Ordinance that authorized the Declaration partially condemning the Property.

The Declaration provides, in relevant part:

> The purpose of the partial condemnation of the [P]roperty involved herein is for the laying out, opening, establishment, widening, straightening, extension, improvement, construction, and maintenance of a public road connecting two existing public roads known as Manor Way; and for the better protection and safety of the travelling public because by connecting the two existing public roads known as Manor Way it will provide another point of access and means of ingress and egress to nearby property owners[,] Township police, fire fighters, ambulances, and other first responders; and for the

---

[1] The Township's Home Rule Charter, as amended (Home Rule Charter), was approved on November 6, 1973, and was effective on January 5, 1976. Prior to the Home Rule Charter's adoption, the Township was governed by the Second Class Township Code, Act of May 1, 1933, P.L. 103, as amended, 53 P.S. §§ 65101 - 68701.

[2] Township of Peters, Washington County Ordinance No. 867, adopted August 9, 2021, effective August 9, 2021.

[3] When the Township preliminarily approved the JWP, it did not include or require a public road connector between the BMAP and the JWP.

performance of other Township services such as snow removal, trash pickup, and road maintenance.

R.R. at 9a (footnote omitted).

On December 15, 2021, the Snyders filed the Preliminary Objections, arguing therein that (1) the taking was arbitrary and capricious; (2) the taking served no public purpose and was only for the JWP developer's benefit; (3) the taking was void because it served no public purpose; (4) there was no substantial or rational proof that the authorized public purpose was the taking's true goal; (5) the Declaration failed to identify Wells Fargo Bank as a condemnee where it held a first lien mortgage on the Property; and (6) the condemnation would not accomplish the purported purpose.

The trial court heard argument on February 16, 2022. On March 10, 2022, the trial court dismissed all but the public purpose, and arbitrary and capricious Preliminary Objections. The trial court permitted the Snyders to schedule depositions to refine the issues of whether the condemnation was for a public purpose, and whether the Township was acting arbitrarily and capriciously. Thereafter, the parties deposed witnesses. On December 14, 2022, the trial court dismissed the remaining two Preliminary Objections. The Snyders appealed to this Court.[4]

The Snyders first contend:

Under [the Fifth Amendment to] the United States [U.S.] Constitution,[5] a sovereign may only condemn private property if the condemnation will serve a public use. Pennsylvania law further limits a sovereign's ability to unilaterally confiscate private property. While the

---

[4] "This Court's standard of review of a decision to condemn property and of the extent of the taking is to determine whether the trial court's decision evidences an abuse of discretion or an error of law." *In re Redevelopment Auth. of the City of Erie*, 285 A.3d 986, 990 n.2 (Pa. Cmwlth. 2022).

[5] U.S. CONST. amend. V.

3

> Township is permitted under [Section 1501 of] the Eminent Domain Code [(Code)[6]] to [condemn the Snyders' P]roperty for "laying out, widening, extending, vacating, grading, or changing the grades of lines or streets," 8 Pa.C.S.[] § 1501, same must still satisfy the [] Code's requirements, including the Property Rights Protection Act [(PRPA)].[7]

Snyders' Br. at 15. The Snyders contend that the condemnation "will provide neither a public use nor [a] public benefit and is thus arbitrary, capricious, and an abuse of discretion under the [U.S.] Constitution and Pennsylvania law." Snyders' Br. at 15. The Snyders assert that the condemnation is "without basis or rational reason. Nor has the Township articulated any reason or basis why it chose to condemn the [Snyders' Property] except under the auspices of public safety which it ignored for 67 years." *Id*. at 16. The Snyders also claim the condemnation is excessive in that the proposed connection between the BMAP and the JWP is unnecessary (where no connection previously existed), and that the condemnation will negatively impact the Snyders' Property.

This Court explained in *In re General Municipal Authority of Nanticoke*, 292 A.3d 1162 (Pa. Cmwlth. 2023):

> While both the federal and state constitutions require that property taken must be for a "public use," the constitutional meaning of "public use" is broader than actual "use" by the public. Snitzer, *Pennsylvania Eminent Domain* § 1.2.2.1 (2023 ed.). In *Kelo v. City of New London*, 545 U.S. 469 . . . (2005), the [U.S.] Supreme Court stated that since it began applying the Fifth Amendment [to the U.S. Constitution, U.S. CONST. amend. V.] to the [s]tates at the close of the 1800s, it has "embraced the broader and more natural interpretation of public use as 'public purpose.'" *Id*. at 480 . . . . The [U.S. Supreme] Court stated that "[w]ithout exception, our cases have defined [public purpose] broadly, reflecting our

---

[6] 26 Pa.C.S. §§ 101-1106.

[7] 26 Pa.C.S. §§ 201-208.

4

longstanding policy of deference to legislative judgments in this field." *Id.*

The courts of this Commonwealth take a somewhat more complex approach to the meaning of public use, rejecting legalistic formulae, instead leaving the definition to "the varying circumstances and situations which arise, with special reference to the social and economic background of the period in which the particular problem presents itself for consideration." *In re Condemnation by* [*the*] *City of Coatesville*, 822 A.2d 846, 855 (Pa. Cmwlth. 2003) [quoting *Dornan v. Phila. Hous*[.] *Auth.*, . . . 200 A. 834, 840 ([Pa.] 1938)]. "**A taking is proper if the benefit to the public is primary and any benefit to a private individual is only incidental**." *In re Condemnation of Land for . . . the S.E. Cent. Bus. Dist. Redev*[*elopment*] *Area #1*, 946 A.2d 1143, 1147 (Pa. Cmwlth. 2008). **The question of what constitutes a public use is highly fact-dependent**. *Reading Area Water Auth. v. Schuylkill River Greenway Ass'n*, . . . 100 A.3d 572, 580 ([Pa.] 2014). **A** "**taking does not lose its public character merely because there may exist in the operation some feature of private gain**, **for if the public good is enhanced it is immaterial that a private interest also may be benefited**." *In re Legis. Route 62214, Section 1-A*, . . . 229 A.2d 1, 3 ([Pa.] 1967) (quotation omitted).

*Nanticoke*, 292 A.3d at 1169 (emphasis added).

The *Nanticoke* Court warned that, "[a]lthough subject to limitations made in the judgment of the General Assembly . . . , under the federal and state constitutions, the occurrence of incidental private benefit does not categorically prohibit individual takings which benefit the public." *Id.* "To be a valid taking, the public use must not only be one which satisfies the federal and state constitutions but must also be a permitted use under legislation delegating the authority." *Id.* at 1172.

The *Nantioke* Court expounded:

[T]he public use for which the properties are to be taken must not run afoul of the limitations of the PRPA. *Reading Area Water Auth.*, 100 A.3d at 582 (**even**

5

**assuming a condemnation can pass constitutional scrutiny, it must also be statutorily permissible**). **Section 204(a) of the PRPA prohibits generally the use of the power of eminent domain to take private property in order to use it for private enterprise**. 26 Pa.C.S. § 204(a). Our Supreme Court explained in *Reading Area Water Authority* that the protections afforded by Section 204(a) [of the PRPA] are to be construed in light of the Legislature's post-*Kelo* intent to curtail abuse of the eminent domain power by effecting constitutionally permissible takings with substantial "ancillary" benefits to private enterprise:

> Notably, [the] PRPA was passed as a direct reaction to *Kelo* to curb what legislators perceived as eminent domain abuse, and with the goal of striking a reasonable balance between (a) the need to defend private property rights from takings accomplished for economic development purposes, and (b) the legitimate needs of urban centers to rehabilitate blighted areas imposing substantial, concrete harm upon the public. *See, e.g.*, House Legis[.] J[.], Nov. 1, 2005, at 2169-72; Senate Legis[.] J[.], April 25, 2006, at 1552. Whether or not the *Constitution* viewed as merely "ancillary" the benefits to private enterprise ensuing from a plan to use eminent domain to assist in economic development, in the wake of *Kelo* the *Legislature* began to view such benefits as central and wanted to curtail the ability of condemnors to take others' property for such purposes. . . .

*Id*. at 583 (citation omitted).

*Nanticoke*, 292 A.3d at 1172-73 (bold emphasis added).

The *Nanticoke* Court concluded:

[T]he PRPA will not thwart a taking if there is a private benefit of any size or nature. While the constitutional analysis often focuses on weighing the respective *benefits* to the public and the private entity, requiring that the public must be found to be the *primary beneficiary* of the

6

project, the analysis under the PRPA is slightly different. **Under the PRPA[,] the focus is on the *purpose* and the *ultimate use* to which the taking is directed.  If the genuine purpose of the taking is for a public use**, i.e., **the public use is the true driving force behind the taking, the PRPA is satisfied even if the project results in some private gain**.  For instance, the taking of land to build a highway to mitigate traffic congestion clearly has a public purpose, even though a number of private contractors may profit from doing the work.  On the other hand, if a road is being built solely in order to provide access to a proposed private development, that likely will not be a public purpose, even though other members of the general public may use the road.  In other words, if the role of the private actor is to facilitate creation of a genuine public use that is permissible under the PRPA, even if some benefit accrues to the private entity (so long as that benefit is not so disproportionate - i.e., primary - as to fail the constitutional test).

*Id.* at 1172-73 (bold emphasis added).

Here, the trial court made the following factual findings:

1. James Berquist [(**Berquist**)], councilman for [the] Township, **voted in favor of the condemnation due to public safety reasons**; he thought the chief of police and fire chief gave "compelling reasons."  He also believed that the residents of the [T]ownship were the beneficiaries. *See* [R.R. at 443a-444a.]  Additionally, [] Berquist did not believe the connector road promoted the economic development of a private enterprise.  [*See i*]*d*. at [445a].

2. David Ball [(**Ball**)], councilman for [the] Township, testified that the [C]ouncil "consistently" connects adjacent developments for public safety, and **believes there to be a public purpose for the connection for this condemnation**. *See* [R.R. at 385a].

3. [Township manager,] Paul Lauer [(**Township Manager Lauer**)], . . . **testified** that there was no benefit to the developer to do the connector; rather, **the condemnation was done for improved access to public safety** - **fire, police, ambulance service, etc**. *See* [R.R. at 335a-337a]. [Township Manager] Lauer noted that first responders

7

heading to Manor Way would usually need to first leave the [T]ownship and return to provide services. [*See i*]*d.* at [338a-339a]. [Township Manager] Lauer testified that it is [T]ownship policy to connect neighboring developments if possible. [*See i*]*d.* at [343a-347a]. . . . Here, there was a recommendation by the planning commission, [the T]ownship planning director, and the [T]ownship manager. [*See i*]*d.* at [350a-352a].

4. [] Township Police Chief Douglas Grimes [(**Police Chief Grimes**)] **testified** that he was present at the August 9, 2021[] [C]ouncil meeting, and gave his opinion that a secondary point of access would be beneficial. *See* [R.R. at 301a]. He noted that **the purpose was to provide ingress and egress to the plan such that emergency services would not have to travel into another jurisdiction**, Upper St. Clair, and then return to [the Township]; there would be two access points to the developments, [the BMAP] and [the JWP], but [the BMAP] specifically. [*See i*]*d.* at [294a-295a]. [Police Chief] Grimes acknowledged that he did not conduct a time study to confirm that an additional access road would reduce the amount of time to reach the [BMAP], but it's "[j]ust simple logic." *Id.* at [295a]. Further, if the plans have two access points, [Police Chief] Grimes stated that the "fatal funnel" effect would be avoided, meaning "you set yourself up for whoever is opposing you. [The situation] becomes much more dangerous." *Id.* at [296a]. Having two access points provides a "tactical alternative and opportunity to respond more quickly. . . ." *Id.* In sum, he testified, "[**i**]**t just creates a better situation from a public safety perspective**." *Id.* at [297a]. "It is never good to have one way in and one way out." *Id.* at [305a].

5. Frank Arcuri [(**Arcuri**)], a councilman for [the] Township who voted twice, recognized that all, or most all, residents who spoke at the meetings who were opposed to the condemnation were from the [BMAP]. *See* [R.R. at 273a, 281a]. He voted against the condemnation, but testified that **the purpose for the road was to connect the new development to an old neighborhood so that emergency service response could be quicker**, **as well as for school bus route efficiency and ease of plowing snow due to the topography**. [*See i*]*d.* at [264a-268a]. [] Arcuri remembered presentations by the police and/or fire

8

departments that indicated it would be quicker for them to provide their services to the [BMAP] if a connector road w[as] built, although he was unsure of the benefit to the [JWP] development. [*See i*]*d*. at [265a, 267a-268a]. [] Arcuri testified that the objections to a connector road were about increased traffic, but that it is always a concern "when we are trying to approve plans." *Id*. at [269a; 273a-275a]. He believed that it was [T]ownship policy to require a connector between two housing plans. [*See i*]*d*. at [273a].

6. Robert Lewis [(**Lewis**)], councilman for [the]Township for 30 years, **testified** that it was the practice of [C]ouncil to "attempt to interconnect developments as they emerge or progress. The action we took was consistent with that [practice]." [R.R. at 243a-244a]. He believed that both housing plans were beneficiaries, as well as the greater [Township] community. [*See i*]*d*. at [244a]. [] Lewis acknowledged that most people at the meetings were opposed to the connection; they were residents of the [BMAP]. [*See i*]*d*. at [245a]. His experience is that traffic concerns are an "unfounded fear." "[I]t never comes to pass" in his experience, which includes a half-dozen developments where connector roads were discussed. *Id*. at [246a]. [] Lewis noted that the [C]ouncil revisited the issue of putting in a connecting road between the two plans in August 2021[,] at the request of **the roads department**, **fire department**, **police department**, **and residents** who "**advocate**[**d**] **for the need for public safety and access into their community**." *Id*. at [246a-247a]. . . .

7. Gary Steigel [(**Steigel**)], councilman for [the] Township, **testified that the purpose of the connector was** "**to improve emergency response times to the** [**BMAP**] **via the** [**JWP**]." *See* [R.R. at 225a]. He noted that the Township looked at an alternate connector via Ammons Drive, but "it was deemed unfeasible." *Id*. at [226a]. [] Steigel acknowledged that the public was concerned about increased traffic, and [it was] "unanimously opposed to the connector." *Id*. at [228a-229a]. **He believed that the benefit of putting in a connecting road was quicker response times for services to the** [**BMAP**] via the [**JWP**]. *Id*. at [229a]. . . .

9

8. [] Township Fire Chief Michael McLaughlin [(**Fire Chief McLaughlin**)] . . . **testified** that there were persons who spoke at the public meeting against the condemnation due to perceived traffic increase. **He**, however, **believes there needs to be a connector for public safety reasons**. [*See i*]*d.* at [204a-205a]. **These benefits are for public safety response times**, **as well as for assisting/benefiting public works**, **school buses**, **and commerce generally**. [*See i*]*d.* at [205a]. [Fire Chief] McLaughlin noted that his testing showed that it would save 2 minutes and 10 seconds of response time in getting to the [BMAP] by having the connector. He also noted that it is not practical to have only one way in and out of a development; for example, if there were down power wires, fallen trees, or a major accident. [*See i*]*d.* at [206a]. [Fire Chief] McLaughlin emphasized that the 2 minutes and 10 second difference is "important" during an emergency. "The faster you can get people there, the better off you are." "Fire doubles in size about every minute. The chance of surviving cardiac arrest decreases significantly every minute that a patient goes without cardiopulmonary resuscitation." *Id.* at [207a].

9. Monica Merrell [(**Merrell**)], councilwoman of [the] Township, testified that the municipal manager, the planning department, and the [T]ownship "have tried to enforce connections between new developments and existing developments." [R.R. at 168a]. Additionally, the [C]ouncil was informed by the planning department at a meeting "that there were no viable alternatives" to connect the two housing plans. *Id.* at [170a]. [] Merrell recalled that no resident was in favor of the connector, and that she voted no both times. [*See i*]*d.* at [178a-180a]. She, as well as the residents, thought there would be an increase in traffic if the condemnation [was] approved, but [] Merrell **recognized that the public purpose for the condemnations was to connect neighboring housing plans**. [*See i*]*d.* at [180a-181a]. Further, [] Merrell is not opposed to the "concept of two points of entry on a plan." *Id.* at [182a]. She, however, voted against the condemnation because eminent domain was not right if people do not want it for that purpose, even though she "recognize[s] that the [T]ownship prefers to have connections[,] [and does not] discount that desire." *Id.* at [179a]. . . .

10

10. Woodrow Welsch [(**Welsch**)] was the developer of the [JWP]. [] Welsch **testified that he received no benefit from the connecting road being built**. *See* [*id*. at 416a-417a]. The connecting road cost him $200,000[.00] to install. [*See i*]*d*. at [411a-412a]. [] Welsch stated that he constructed the road because the [T]ownship required it; he assumed that if he did not build it, [it] would not approve his development plan. [*See i*]*d*. at [416a-417a].

11. **Jason Snyder** . . . **testified** that he purchased his [P]roperty in [the] Township because it was on a dead-end road next to the woods; he wanted few neighbors. *See* Deposition of [Jason] Snyder, June 13, 2021, [at] 14.[8] . . . Now, there is a new development, [the JWP], abutting his [P]roperty. [*See i*]*d*. at 15. [] [Jason] Snyder testified **that the purpose of the condemnation was** "**safety** - safety of taking that - taking my [P]roperty **to have quicker access for emergency vehicles**." *Id*.

R.R. at 626a-631a (emphasis added).

The trial court concluded:

Based upon this testimony, the [trial] court cannot find that the [Snyders] met their "heavy" burden of proving that the condemnation was for anything but a public purpose. All of the deponents recognized why the [] [C]ouncil condemned the [P]roperty - permitting emergency services to more quickly access the [BMAP] of homes. Even those councilpersons who did not vote for the plan understood why the [] Township [p]lanning [d]epartment, the fire chief, and the police chief recommended the condemnation. Although the [T]ownship does not mandate a connecting road between two developments, it is the policy to do so if reasonably feasible. As noted in the [T]ownship's Comprehensive Plan adopted on December 9, 2013, "[c]onnections between subdivisions can help manage traffic flow. Many of the [T]ownship's subdivisions do not connect with neighboring properties, so travelers are forced to drive between subdivisions." *See* [Snyders'] Brief in Opposition to Preliminary Objections, Feb[.] 22, 2022, Exhibit A, [] Township Comprehensive Plan, [at] 62. The plan notes that a goal is to "improve

---

[8] Jason Snyder's deposition transcript is not included in the Reproduced Record.

traffic efficiency and safety along Route 19 and at major intersections throughout the [T]ownship." *Id*. at [] 64. To address this goal, the [T]ownship concluded that it should, among other things, "[c]onsistently require road interconnectivity between both residential and non-residential developments to disperse traffic, provide route options, reduce conflict points along major roads, and improve access for emergency services." *Id*. Further, no benefit inured to [] Welsch, the developer, by building the connecting road. [] Welsch certainly benefited by developing the [JWP], but he was required to put in the connecting road as a condition to develop the plan.

R.R. at 631a-632a (citation omitted).

The law is well established:

As the fact-finder, the trial court had the authority to make credibility determinations and resolve conflicts in evidence. *Merrell v. Chartiers Valley Sch*[.] *Dist*[.], 51 A.3d 286, 293 (Pa. Cmwlth. 2012). In so doing, the trial court was "free to believe all, part, or none of the evidence." *In re Funds in Possession of Conemaugh* [*Twp.*] *Supervisors*, . . . 753 A.2d 788, 790 ([Pa.] 2000).

*Schnarrs v. Rush Twp. Bd. of Supervisors*, 210 A.3d 1161, 1175 (Pa. Cmwlth. 2019). "[A]rguments go[ing] to the credibility and weight of the evidence [are] issues within the sole province of the trial court as the fact[-]finder, and [this Court] will not disturb them on appeal." *Belleville v. David Cutler Grp.*, 118 A.3d 1184, 1196 (Pa. Cmwlth. 2015).

Here, the trial court credited numerous witnesses' testimony, including that of Township Manager Lauer, who stated that the condemnation's purpose was to improve public safety, and Police Chief Grimes and Fire Chief McLaughlin, who testified that the connecting road would provide quick access for emergency responses. That testimony was substantial evidence that the condemnation's actual purpose is improved access to public safety services such as fire, police, and ambulance service, and thus, the "benefit to the public is primary and any benefit to

12

a private individual is only incidental." *Nanticoke*, 292 A.3d at 1169 quoting (*In re Condemnation of Land for the S.E. Cent. Bus. Dist. Redev. Area #1*, 946 A.2d at 1147). Thus, the condemnation at issue here does not violate the U.S. Constitution. Further, the condemnation complies with the PRPA because the record evidence supports the conclusion that the Township's "genuine purpose of the taking is for a public use, i.e., the public use is the true driving force behind the taking[.]" *Nanticoke*, 292 A.3d at 1173.

With respect to the Snyders' contention that the condemnation is excessive, this Court acknowledges that "a plan to take must be tailored to the actual purpose or it will be overturned as excessive." *Middletown Twp. v. Lands of Stone*, 939 A.2d 331, 338 (Pa. 2007). The trial court correctly recognized, "there was nothing of record discussing, addressing[,] or indicating that the condemnation was excessive, i.e.[,] that the size of the connecting road was greater than the size of typical housing plan roads or beyond the size permitted by zoning ordinances." R.R. at 632a-633a. Thus, the Snyders' argument is not supported by the record evidence.

The Snyders also assert that the condemnation was unnecessary and that it simply satisfied a Township requirement that there be interconnections between subdivisions, rather than benefitting the public. The Snyders also assert that the condemnation was unnecessary and that it simply satisfied a Township requirement that there be interconnections between subdivisions, rather than benefitting the public. Township Manager Lauer testified that the development plan's approval was not conditioned upon the developer constructing a connector, and that no Township ordinance requires it. The trial court found that, although not required in an ordinance, it is the Township's policy to require a developer to construct a connector between developments if it is reasonably feasible to do so. More importantly, the trial court found that the purpose for the taking was to improve public safety. Thus, the Snyders' claim is without merit.

13

Finally, the Snyders contend that the trial court erred by failing to conclude that the Council was barred by *res judicata* when it approved the condemnation on August 9, 2021, approximately three months after voting against it. "*Res judicata* - literally, **a thing adjudicated** - is a judicially-created doctrine. It bars actions on a claim, or any part of a claim, which was the subject of a prior action, or could have been raised in that action." *In re Coatesville Area Sch. Dist.*, 244 A.3d 373, 379 (Pa. 2021) (bold emphasis added; citation omitted).

> "Four elements common to both actions, sometimes termed the "four identities," *see, e.g.*, *Est*[.] *of Tower*, . . . 343 A.2d 671, 674 ([Pa.] 1975), must be present for *res judicata* to apply: "an identity of issues, an identity of causes of action, identity of persons and parties to the action, and identity of the quality or capacity of the parties suing or being sued." *In re Iulo*, . . . 766 A.2d 335, 337 ([Pa.] 2001).

*Coatesville*, 244 A.3d at 379. "In order for the principles of *res judicata* . . . to apply there must be a final **adjudication** on the merits by a [tribunal] of competent jurisdiction." *Dep't of Env't Prot. v. Fiore*, 682 A.2d 860, 862 (Pa. Cmwlth. 1996) (italic and bold emphasis added).

The U.S. Supreme Court has declared that "the decision to exercise the power of eminent domain is **a legislative function** . . . ." *First Eng. Evangelical Lutheran Church of Glendale v. Cnty. of Los Angeles, Cal.*, 482 U.S. 304, 321 (1987) (emphasis added). Long ago, the Pennsylvania Supreme Court explained:

> Taking land for a public highway is taking it for a public use. **The degree of the public necessity is exclusively for the legislature**. It is not a judicial question. We may and will take care that private property is taken under an assertion of eminent domain for no other than a public use.

14

*Smedley v. Erwin*, 51 Pa. 445, 451(1866) (emphasis added). Referencing assertions made by Judge Rogers in *Pittsburgh v. Scott*, 1 Pa. 309 (Pa. 1845), the *Smedley* Court continued:

> [T]o justify the exercise of the right to take the property of the citizen, "it must be for the use of the public, to be determined in the first place **by the legislature**, subject, however, to correction or restriction when it clearly appears the right is abused, either by design, which we cannot well suppose, or, what is more to apprehend, by hasty and improvident legislation." The abuse of which he spoke is the transgression of power in attempting to take private property for private use.
>
> That might be by design, or, more likely, improvidently and hastily. But when the use is an undoubted public one, as is appropriation for a highway, **it would be usurpation in us to prevent the execution of an act of the legislature** because we might think it indiscreetly passed or enacted without proper consideration.

*Smedley*, 51 Pa. at 451 (emphasis added).[9]

Consequently, the Council's May and August 2021 votes were legislative decisions pertaining to whether the Council should approve the Ordinance. Because they were not judicial adjudications, *res judicata* does not apply. Accordingly, *res judicata* did not prohibit the Council's August 9, 2021 vote approving the Ordinance.

For all of the above reasons, the trial court's order is affirmed.

_____
ANNE E. COVEY, Judge

---

[9] Notably, this Court has previously applied the application of *res judicata* sparingly in zoning matters, "perceiving the need for flexibility in land use matters to outweigh the burdens of repetitive litigation." *Dubois Dutch, LLC v. Sandy Twp. Bd. of Supervisors*, 940 A.2d 576, 580 (Pa. Cmwlth. 2007).

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Peters Township, a PA Municipality    :
                                             :
            v.                                  :
                                             :
Jason H. Snyder and Sherri L. Snyder,    :
Husband and Wife,                      :    No. 45 C.D. 2023
                     Appellants       :

# O R D E R

AND NOW, this 8th day of November, 2023, the Washington County Common Pleas Court's December 14, 2022 order is affirmed.

 

_____
ANNE E. COVEY, Judge