IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re: Condemnation by the Township of : 
Blythe of a Portion of the Property Owned : 
by Julia Fatula, Anna Sciuchetti, Charles : 
Bucklar, Jr., and John Bucklar, and the : 
Unknown Heirs and Assigns of John : No. 1244 C.D. 2018
Bucklar, Sr., and the Unknown Heirs and : 
Assigns of Charles Bucklar, Sr., and : Argued: December 10, 2019
Unknown Persons and Interested Parties, : 
Located in Blythe Township, Schuylkill : 
County, Schuylkill UPI 02-06-0006 : 
 : 
Appeal of: Julia Fatula, Anna Sciuchetti, : 
Charles Bucklar Jr. and John Bucklar : 


BEFORE: HONORABLE RENÉE COHN JUBELIRER, Judge
HONORABLE PATRICIA A. McCULLOUGH, Judge
HONORABLE ANNE E. COVEY, Judge


*OPINION NOT REPORTED*

MEMORANDUM OPINION
BY JUDGE McCULLOUGH                              FILED: February 12, 2020


Julia Fatula, Anna Sciuchetti, Charles Bucklar Jr., and John Bucklar ("Condemnees") appeal from the August 10, 2018 order of the Court of Common Pleas of Schuylkill County (trial court) overruling, in part, and sustaining, in part, their preliminary objections ("POs") to Blythe Township's ("Township") Declaration of Taking of 6.322 acres in fee and a 2.221-acre parcel as a temporary construction easement for the construction and operation of a 1500-ton per-day construction and demolition waste recycling and disposal facility called the Blythe Recycling and Disposal Site ("the Landfill"). On appeal, Condemnees argue that the trial court erred

in finding that (1) the Township did not delegate its eminent domain powers to the private landfill developers; and (2) the private landfill developers were not the primary and paramount beneficiaries of the Landfill. Condemnees also challenge the trial court's refusal to consider whether a second class Township may exercise its eminent domain powers for the primary purpose of engaging in a profitable enterprise with a private party.

## 1. Factual Background

Condemnees are one-half owners of certain property located on an old strip mine area in Blythe Township, Schuylkill County. (Trial court op., at 3.) The remaining one-half interest is held by the unknown heirs and assigns of John Bucklar, Sr. *Id.* at 1.

At some point prior to 2003, the Township decided to construct the Landfill. In November 2003, the Township entered into an agreement ("2003 FKV Agreement") with a private landfill developer, FKV LLC ("FKV"), to purchase a 400-acre parcel for the purpose of building and operating the Landfill. *Id.* at 3. The Landfill was to be financed by non-recourse bonds, meaning that it would be paid solely from the Landfill's revenues, with no initial outlay of money by the Township. (Reproduced Record (R.R.) at 53a.) The entire Landfill would not be constructed all at once. The Landfill would be constructed of cells and consist of up to six "cells," i.e., designated areas where the waste would be stored. (R.R. at 21a.)

Under the 2003 FKV Agreement, FKV would provide technical and financial expertise to the Township, assist it in securing all necessary approvals and permits, and help market the Landfill to potential customers. (R.R. at 21a.) The 2003 FKV Agreement provided that "Major Decisions" shall require the written approval of both the Township and FKV. *Id.* "Major Decisions" included: the hiring and firing of

2

the operator of the facility, financing for the project, mortgaging or placing encumbrances on the Landfill, determining the Landfill's annual operating budget and, at issue here, the "acquisition or disposition … of any real property or interests therein for the [f]acility." (Trial court op., at 3.) In October 2007, the Township and FKV amended the 2003 FKV Agreement, but left intact the terms requiring written approval by FKV for real property acquisition and disposition by the Township ("2007 FKV Agreement"). (Trial court op., at 3-4.) Title to the 400-acre parcel was transferred to the Township by deed dated July 10, 2012. (R.R. at 83a.) Thereafter, FKV and the Township mutually cooperated with respect to the preparation, submission, and prosecution of an application with the Pennsylvania Department of Environmental Protection ("DEP") for a solid waste permit for the Landfill. *Id.* On January 20, 2015, the DEP issued Solid Waste Permit No. 101679 to the Township ("the Permit"). (R.R. at 121a-124a.) Among the challenges that the Township faced in designing and obtaining a permit for the Landfill was the Eastern Pit, an abandoned strip-mining pit with 50-foot highwalls, located partially on the Landfill site and partially on Condemnees' property. Under the Permit issued by the DEP, the Township was given two options regarding the Eastern Pit, either: (1) fill the entire Eastern Pit (including the portion located on Condemnees' property) to support the Landfill's liner system; or (2) modify the Permit to engineer a 100-foot mechanically-stabilized earthen wall ("MSE wall") adjacent to the Eastern Pit. (R.R. at 124a.) After considering the physical and financial benefits/detriments involved, the Township chose to backfill the entire Eastern Pit to support the Landfill's liner system, rather than build the MSE wall. This option required the Township to acquire a portion of Condemnees' property.

On September 6, 2017, FKV assigned all of its rights and interests in the 2007 FKV Agreement to Schuylkill C&D ("SCD" or together with FKV "private

3

landfill developers"), with the exception of the right to recoup all of the actual costs it spent to that point to develop the Landfill. *Id.* On December 1, 2017, the Township and SCD entered into a Facility Management Agreement ("2017 SCD Agreement"). (R.R. at 20a.) Under the 2017 SCD Agreement, SCD agreed to act as an agent for the Township to, among other things, consult with and supervise the project engineer and other consultants for the Landfill concerning the development and preparation of specifications for the operation and maintenance of the facility; audit the operation of the Landfill to ensure compliance with federal, state, and local regulations, and permits and licenses; and be responsible for all sales and marketing of the Landfill. (R.R. at 84a.) In exchange for these responsibilities, and for the work previously performed, SCD would be compensated and take a proportionate share of the profits from the operation of the Landfill. (R.R. at 93a-94a.) Like the 2003 and 2007 FKV Agreements and the 2017 SCD Agreement, the Township was required to obtain FKV's prior written approval before acquiring or disposing of any real property. (R.R. at 85a.)

## 2. The Declaration of Taking

On March 14, 2018, the Township Board of Supervisors adopted Resolution 5 of 2018, authorizing the condemnation of 6.322 acres of Condemnees' property and a corresponding 2.221-acre temporary construction easement for the Landfill project.[1] (R.R. at 134a-135a.)

---

[1] The trial court *sustained* Condemnees' preliminary objection which challenged the Township's taking of a pond on Condemnees' property on the grounds that the attempt was in violation of section 9 of the Water Rights Act, Act of June 24, 1939, P.L. 842, *as amended*, 32 P.S. §639.

4

On March 19, 2018, by way of Declaration of Taking (Declaration), the Township sought to condemn a portion of the Condemnees' property consisting of 6.322 acres taken in fee, which included a portion of the Eastern Pit and surrounding property, as well as a 2.221-acre parcel that partially surrounds the 6.322-acre parcel, for use as a temporary construction easement.[2]  The stated purpose of the taking was:

> 1) for landfill purposes—to conduct abandoned mine highwall reclamation, grading and construction, and maintenance of surface water controls that are authorized and/or required by permits issued by the [DEP], including but not limited to [DEP] Solid Waste Permit No. 101679, issued on January 20, 2015, and necessary for the construction and operation of [Township's] landfill, which is located on an adjacent parcel; and 2) to remove hazardous conditions, improve and make safe the current topography which includes abandoned open mine excavations and/or piles of overburden commonly known as "stripping pits" in order to protect, and preserve the public health, safety, convenience, and welfare of the residents of the Township as well as the general public.

(R.R. at 129a.)

### 3. Condemnees' Preliminary Objections

On April 11, 2018, Condemnees filed POs to the Declaration asserting, in relevant part, as follows: (1) the public will not be the primary and paramount beneficiary of the Township's exercise of eminent domain because the financial rewards the private landfill developers will receive from the Landfill will exceed those

---

[2] It is not disputed that the Township purports to exercise eminent domain pursuant to section 2104 of the The Second Class Township Code, Act of May 1, 1933, P.L. 103, added by the Act of November 9, 1995, P.L. 350, *as amended*, 53 P.S. §67104, which authorizes a second class township to acquire property for "landfill purposes."

to be gained by the Township; (2) the Township's power of eminent domain was unconstitutionally delegated to the landfill developers because the Township was required to obtain the landfill developers' written approval before acquiring any property necessary for the construction and operation of the Landfill; and (3) the Township's taking was excessive and done in bad faith because the Township could construct an MSE wall, rather than fill the Eastern Pit, and there would be no need to condemn their property.

### 4. The Evidentiary Hearing

An evidentiary hearing was held on June 29, 2018. In support of their claim that the Township unlawfully delegated its eminent domain powers to the landfill developers, Condemnees pointed to the language in the 2003 and 2007 FKV Agreements and the 2017 SCD Agreement (collectively "Agreements"), which required the Township to obtain written approval by the private landfill developers before acquiring any property relative to the construction and operation of the Landfill. They also pointed to language in the aforementioned Agreements, which showed that the private landfill developers controlled the permitting, financing, operation, and marketing of the Landfill. Condemnees read into the record the deposition testimony of Al Lubinsky, former Chairman of the Township Board of Supervisors, who agreed that the Township was the applicant for the DEP Permit in name only, and that the landfill developers performed all the work, obtained the permits and bonding, and paid the costs. (R.R. at 4a, 43a-44a.) They also presented the testimony of Christopher McCoach, part owner of an adjoining parcel, who testified that the Township's Board of Supervisors sent him a letter asking for permission to fill the portion of the Eastern Pit located on his property. McCoach further testified that when he did not respond to

6

the letter, Paul Datte, SCD's attorney, called him on behalf of the Township to negotiate an amicable purchase or easement over his property. (R.R. at 37a.)

In support of their claim that the condemnation was not for a public purpose, Condemnees presented evidence to demonstrate that the private landfill developers will receive greater net income than the Township, while the Township is burdened with the risks, including potential DEP civil penalties. (R.R. at 58a.) Condemnees highlighted language in the Agreements, which entitled FKV and SCD to recoup all of their actual costs advanced by them to develop the Landfill. (R.R. at 93a.) Steven Fields, owner of SCD, testified that the Township must also pay SCD a fee of seventy-five cents per cubic yard of permitted capacity for each additional cell constructed if, and when, the initial first two cells are filled. (R.R. at 45a-47a, 49a.) In addition, SCD will collect fifty percent of the net revenues plus $1.00 per ton for waste accepted at the facility. (R.R. at 47a-48a.) Based on these figures, Fields agreed that if the Landfill is successful, SCD will receive $12 million more than the Township will receive over the life of the Landfill. (R.R. at 48a-49a.)

In opposition, the Township established that the Landfill will be permitted in the Township's name and that the Township will own the Landfill and the land condemned. (R.R. at 105a.) The Township presented its landfill design engineer, Richard M. Bodner, P.E., who explained that the purpose of the condemnation was to fill the portion of the Eastern Pit which is located on Condemnees' property. (R.R. at 110a.) Bodner explained that backfilling the Eastern Pit accomplishes the following landfill purposes: (i) it establishes the structural foundation for constructing the Landfill's liner system; (ii) it meets a condition of the Permit to manage stormwater that approaches the Landfill from the east; (iii) it reduces the possibility of stormwater runoff from getting into the deep mines below the Landfill and becoming acid mine

7

drainage; (iv) it allows for the potential restoration of the Little Wolf Creek; (v) it prevents dumping materials into a strip mine pit as is currently taking place; and (vi) it remediates a potentially dangerous highwall/vertical cliff condition for the safety of the Landfill's personnel and visitors. (R.R. 110a-115a.) Bodner testified that these were the only purposes for which the Township condemned Condemnees' property. (R.R. 116a.)

With respect to the reasons behind the Township's decision to backfill the entire Eastern Pit, rather than build the MSE wall, Bodner testified that the MSE wall option was not yet authorized under the DEP Permit. He explained that building the MSE wall would (i) require extensive modifications to the Permit which will result in a 12- to 18-month delay; (ii) cost the Township over $1 million dollars more than filling the Eastern Pit; (iii) not prevent the flow of stormwater into the deep mines beneath the Landfill; and (iv) result in a 110-foot vertical drop-off, posing a danger to people and equipment working on Landfill operations. (R.R. at 117a-119a.)

In response to questions by the trial court, Lubinsky and Fields both candidly agreed that the Township's original decision to construct the Landfill was not to provide an area for its residents to dispose of their construction/demolition waste, but rather, to provide a source of revenue to be utilized by the Township for other municipal purposes. Lubinsky testified that the purpose of the Landfill project was to generate income for the Township. (R.R. at 42a.) Fields also testified that the Landfill was meant to be a revenue source for the Township. (R.R. at 108a.)

Finally, the parties stipulated that the Township was projected to receive in excess of $47 million in revenue from the Landfill over the next 20 years. (R.R. 24a.) The Township's total revenues from all sources, without the Landfill, was forecasted to be $411,788.37. *Id.* The Township intends to use this revenue to fund local fire

8

departments, senior citizens and other non-profit organizations, municipal sewer systems, the Township's police department, and road maintenance and repair. (R.R. 24a, 125a.)

### 5. The Trial Court's Opinion

On August 10, 2018, the trial court issued an opinion addressing each of Condemnees' POs.

### A. **Public/Private Benefit**

With regard to Condemnees' argument that the public would not be the primary and paramount beneficiary of the Township's exercise of eminent domain, the trial court concluded that the question of public versus private benefit focused on the purpose of the condemnation at issue, and not on which party would receive the most income over the life of the Landfill. The trial court found that the condemnation would result in, *inter alia*, multi-million dollar savings in the cost of constructing the Landfill by eliminating the need to build the MSE wall to support the Landfill's liner system and, furthermore, would provide a safer work environment and other environmental benefits. Based on these findings, the trial court concluded that the condemnation primarily served a public purpose, despite the benefit the landfill developers would receive. (Trial court op., at 12.) The trial court explained:

> [T]he primary objective of the condemnation is to obtain land to provide support to the liner system of the landfill which is to be constructed on land owned by [the Township] with the Township expecting to receive benefits of being able to offer its residents free waste disposal while [] also anticipating the reaping of millions in revenue over the life of the landfill.

*Id.*

9

Citing *Belovsky v. Redevelopment Authority of Philadelphia*, 54 A.2d 277 (Pa. 1947), the trial court concluded that it was of no moment that SCD may, in the end, receive more revenue from the venture than the Township. The trial court noted that a taking does not lose its public character simply because some future private gain may result and that, if the public good is enhanced, it is irrelevant that a private interest may benefit from the taking. (Trial court op., at 12.)

In footnote 3 of its opinion, the trial court, *sua sponte*, questioned whether the legislature envisioned a second class township utilizing its eminent domain power for the primary purpose of engaging in a profitable enterprise with a private entity when it allowed for the use of such power for "landfill" purposes under 53 P.S. §67104. *Id.* at 10 n.3. However, the trial court noted that Condemnees did not raise this precise issue in their POs, and declined to analyze it. *Id. See also* Pa.R.A.P. 1925(a) Opinion, at 4 ("Because that precise issue was not raised nor addressed by evidence or argument, the court did not find it would be proper to either party for it to delve into analyzing the question.").

## B. Unlawful Delegation of Eminent Domain Power

The trial court next addressed Condemnees' argument that the Township's power of eminent domain was unconstitutionally delegated to the private landfill developers because the Township was contractually obligated to obtain their written permission before acquiring any property for the operation of the Landfill. The trial court found that the Township did not unconstitutionally delegate its power of eminent domain to private parties. The trial court began its analysis by examining the reference to the Township's "acquisition" of real property and interests in the Agreements and found that it encompassed the acquisition of property by eminent domain. *Id.* at 13. The trial court next concluded that it "defied logic" to believe FKV and SCD were not

consulted and did not agree to the Township's acquisition of Condemnees' land by condemnation. *Id.* Nevertheless, the trial court found there was no evidence to support a finding that the Township "ceded" its power to any private entity. *Id.* The trial court explained:

> [t]he fact that [the Township] agreed that major decisions such as land acquisition required consent of FKV and SCD does not equate to its having surrendered its eminent domain power to third parties. No evidence indicated that [the Township] was directed to condemn that land by a private party or that the condemnation was for the sole benefit of any third party.

*Id.* at 12-13.

Condemnees filed a notice of appeal, raising the following issues: (1) whether the trial court abused its discretion or erred by failing to find that the Township unlawfully delegated its eminent domain powers by agreeing to obtain the private landfill developers' written approval before acquiring property for the Landfill; (2) whether the trial court abused its discretion or erred by failing to find that SCD was the primary and paramount beneficiary of the Township's exercise of eminent domain since SCD would receive more financial compensation from the Landfill than the Township; and (3) whether the trial court erred in finding, in footnote 3 of its August 10, 2018 Opinion, that Condemnees had not raised the issue of whether the Township could use eminent domain for the primary purpose of engaging in a profitable enterprise with a private entity. (Condemnees' Pa.R.A.P. 1925(b) Statement, Condemnees' Br., Ex. B at 1-2.)

The trial court issued a supplemental opinion pursuant to Pa.R.A.P. 1925(a), providing further explanation for overruling Condemnees' POs, and addressing Condemnees' argument regarding footnote 3.

11

*1. Whether the Trial Court Erred by Failing to Find that the Township Unlawfully Delegated Its Power of Eminent Domain to the Private Landfill Developers*

On appeal,[3] Condemnees argue that the Township unlawfully delegated its power of eminent domain to FKV (in the 2003 and 2007 Agreements) and SCD (in the 2017 Agreement) by agreeing to obtain their written permission before acquiring any property relative to the operation of the Landfill. They contend that private parties may not direct the condemnation of property in contracts, such as the Agreements at issue here. They argue this case falls squarely within our holding in *In Re: Condemnation of 110 Washington Street, Borough of Conshohocken, Pennsylvania, by the Redevelopment Authority of the County of Montgomery, for Urban Renewal Purposes*, 767 A.2d 1154 (Pa. Cmwlth. 2001).

In *110 Washington Street*, there was a contractual arrangement between a redevelopment authority and a private developer that gave the developer the final say on the offer to be made for the condemnation, including when it would be made and the amount. This Court held the attempted delegation was illegal and void. In that case, the Redevelopment Authority of the County of Montgomery (the "Authority") and Donald Pulver, the principal of Greater Conshohocken Improvement Corporation ("GCIC"), developed a plan to eliminate blight in Montgomery County, Pennsylvania. In 1986, the Authority and GCIC entered into an agreement whereby the Authority was to acquire certain targeted properties by eminent domain and convey them to GCIC for development. *Id.* at 1156. Importantly, the agreement provided that the Authority could initiate condemnation proceedings against the property only when directed to do

---

[3] Our scope of review is limited to determining whether the trial court abused its discretion or committed an error of law. *In re Condemnation by the Department of Transportation*, 871 A.2d 896 (Pa. Cmwlth. 2005).

12

so by Pulver. Specifically, under Section 3(c) of the agreement, the Authority was to, *inter alia*, "[a]cquire by Eminent Domain, any real property, including improvements and fixtures for the public purposes of the Urban Redevelopment Law [(URL)].[4]" *Id.* Section 3(d) stated that "[n]otwithstanding anything to the contrary contained herein, *[the Authority] shall not undertake any of the activities set forth in section[ ]3(c) of this Agreement except at the specific request of [GCIC]*." *Id.* (Emphasis added.)

In 1993, the Authority and GCIC entered into another agreement which specifically related to the acquisition of property owned by R&J Holding Company. *Id.* Pursuant to that agreement, the Authority agreed that it was not "authorized" to "*file a Declaration of Taking of [the R&J Holding property] without the prior written consent of [GCIC]*." *Id.* at 1157. (Emphasis added.)

In 1995, the Authority entered into a surety agreement with TBFA Partners, whose principal was Pulver. The surety agreement stated that TBFA wanted the Authority to initiate condemnation proceedings to acquire the R&J Holding property, and that TBFA was to post security for the taking "to induce" the Authority "to commence acquisition and condemnation proceedings in order to acquire [the R&J Holding property]." *Id.* The Authority thereafter offered to purchase R&J Holding's property and, when its offer was rejected, it filed a declaration of taking. R&J Holding opposed the taking, arguing that it was unlawful because—by giving Pulver the power to determine whether and when to initiate condemnation proceedings—the Authority had improperly delegated its eminent domain powers. *Id.* The common pleas court approved the taking over R&J Holding's objection, and R&J Holding appealed to this Court. *Id.*

---

[4] Act of May 24, 1945, P.L. 991, *as amended*, 35 P.S. §§1701-1719.2.

13

This Court reversed. We began our analysis by noting that the power to take private property through eminent domain "may not be delegated by agreement or contract." *Id.* at 1158-1159. We observed that the Authority was granted the power of eminent domain through Sections 9(i) and 12 of the URL, 35 P.S. §§1709(i), 1712, and that the URL does not authorize the Authority to impair its ability to exercise this power through contract or agreement, or be prohibited from exercising this power absent a redeveloper's written request. *Id.* at 1160. We held: "[t]he General Assembly has bestowed upon [the Authority] the power of eminent domain, and [the Authority] may not compromise its authority to exercise this power based on the written consent of another party." *Id.* In other words, the state has given development authorities the power of condemnation *via* eminent domain, but it did not give them the power to delegate that authority to other parties *via* contract.

Turning to the language of the agreements, we agreed with R&J Holding that the Authority had given Pulver the power to determine whether and when to condemn the subject property. We noted that although the declaration of taking was filed by the Authority, the Authority "was purportedly not authorized to take this action without Pulver's prior written consent." *Id.* In essence, Pulver directed the condemnation of R&J Holding's property; thus, the Authority was merely acting on Pulver's behalf. *Id.* We concluded that such a transfer of eminent domain power "is patently without authority of law and that any agreement which purportedly transfers such power to a private individual must be deemed to be void and unenforceable." *Id.* We therefore invalidated the taking and remanded the case to the court of common pleas.

Here, the Township argues that, unlike in *110 Washington Street*, the Agreements at issue did not limit or address the Township's power to exercise its right

14

to acquire property by eminent domain. The Township notes that the Agreements neither make reference to eminent domain nor include eminent domain as among the "Major Decisions" that require written approval of both the Township and landfill developers.

As noted, the trial court summarily rejected the Township's argument to the extent it argued that references in the Agreements to "acquisition" of real property or interests therein do not encompass it doing so by eminent domain. The trial court found the argument to be devoid of merit, without the need to consult any dictionary or any source for clarification. (Trial court op., at 13.) As a threshold matter, this Court agrees with the trial court's assessment on this particular point. In interpreting the terms of a contract, the cardinal rule followed by courts is to ascertain the intent of the contracting parties. *Lesko v. Frankford Hospital–Bucks County*, 15 A.3d 337, 342 (Pa. 2011). If the contractual terms are clear and unambiguous on their face, then such terms are deemed to be the best reflection of the intent of the parties. *Kripp v. Kripp*, 849 A.2d 1159, 1162 (Pa. 2004). If, however, the contractual terms are ambiguous, extrinsic evidence is appropriate to ascertain their meaning. *Murphy v. Duquesne University of the Holy Ghost*, 777 A.2d 418, 429 (Pa. 2001). A contract's terms are considered ambiguous "if they are subject to more than one reasonable interpretation when applied to a particular set of facts." *Id.* at 430. A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends; and a contract is not rendered ambiguous by the mere fact that the parties do not agree upon the proper construction. *State Highway and Bridge Authority v. E.J. Albrecht Co.*, 430 A.2d 328 (Pa. Cmwlth. 1981). Moreover, "[t]he entire contract should be read as a whole...to give effect to its true purpose." *Pritchard v. Wick*, 178 A.2d 725, 727

15

(Pa. 1962). A contract must be interpreted to give effect to all of its provisions. *Murphy*, 777 A.2d at 429. Thus, this Court must "not interpret one provision of a contract in a manner which results in another portion being annulled." *LJL Transportation v. Pilot Air Freight*, 962 A.2d 639, 648 (Pa. 2009). "A word used by the parties in one sense is to be interpreted as employed in the same sense throughout the writing in the absence of countervailing reasons," such as thwarting the intent of the agreement. *Maloney v. Glosser*, 235 A.2d 607, 609 (Pa. 1967). Finally, a party's performance under the terms of a contract is always relevant in interpreting writing. *Atlantic Richfield v. Razumic*, 390 A.2d 736, 741 (Pa. 1978).

Applying these precepts, this Court agrees with the trial court that the term, "acquisition," as used in the Agreements is clear and unambiguous. Clearly, a second class township may acquire property by condemnation *or* amicably—by negotiation and agreement. While the words "eminent domain" do not appear in the Agreements, the Agreements also do not limit the term "acquisition" only to the procurement of real property by negotiation and agreement. Contrary to the Township's argument, the absence of the term "eminent domain" in the Agreements is not determinative of whether the Township unlawfully delegated its power of eminent domain.

Next, viewing the Agreements as a whole, this Court concludes that it was neither the intent of the parties, nor the import of the Agreements, to cede the Township's power of eminent domain to the private landfill developers. The 2003 FKV Agreement provides that all "Major Decisions" shall require the written approval of the Township and FKV. (R.R. at 63a-64a.) "Major Decisions" include: the hiring and firing of the operator of the facility, financing for the project, mortgaging or placing encumbrances on the Landfill, determining the Landfill's annual operating budget and,

16

the "acquisition or disposition of any real property or interests therein for the [f]acility." *Id.* This same language was carried through to the 2007 FKV Agreement and the 2017 SCD Agreement. Critically, this language appears in context of "Major Decisions" regarding the Landfill which had to be approved by both parties. "Major Decisions" includes both the acquisition and disposition of property, which supports the conclusion that the intent of the Agreement in requiring the landfill developers' approval was not to give the landfill developers *carte blanche* authority to decide when and what to condemn, but rather to ensure that all land necessary is available to serve the Landfill's purpose—from a practical/useful standpoint—before making "major" decisions regarding property for the Landfill (regardless of how it intended to acquire or dispose of the property). The landfill developers, after all, were the ones to provide the expertise and know-how on construction waste disposal landfill matters.

In this Court's view, this arrangement does not equate to the "unlawful delegation" of eminent domain power which occurred in *110 Washington Street*, where the Authority unquestionably contractually relinquished its authority to exercise eminent domain powers to Pulver. Pursuant to the agreements in *110 Washington Street*, the Authority was prohibited from acquiring real property by eminent domain, except at the specific request and direction of Pulver. Pulver instructed the Authority when to condemn particular properties within the project area, and the evidence demonstrated that the Authority began condemnation proceedings against the R&J Holding property upon Pulver's instruction. Thus, under the arrangement in that case, Pulver controlled what property was taken, paid for all expenses, and was able to demand that the Authority institute eminent domain proceedings against R&J Holding. In those circumstances, we found the Authority's ability to exercise its power of eminent domain was unlawfully impaired by its contracts with Pulver.

17

Here, unlike in *110 Washington Street*, the Agreements did not preclude or otherwise restrict the Township's exercise of eminent domain. Although the landfill developers do have a say in "Major Decisions" concerning the Landfill, including the Township's acquisition and disposition of property, the Agreements do not vest the developers with authority to decide when, or if, the Township will initiate the use of eminent domain. Moreover, we are permitted to consider the parties' performance under the terms of a contract to decipher the meaning of a contract term. *Atlantic Richfield*, 390 A.2d at 741. The trial court specifically found, based on the evidence, that no private party provided either oral or written approval or direction to the Township to condemn Condemnees' property. (Trial court op., at 13.) We discern no error. Undisputed evidence established that the Township did not ask the landfill developers for permission to condemn Condemnees' property and the landfill developers did not provide either oral or written approval or direction to the Township to condemn Condemnees' property. (R.R. at 107a.) Although it is true that, if SCD decides that certain land is unnecessary from a logistical standpoint for the construction and operation of the Landfill, then this would tangentially result in the Township not using its power of eminent domain to acquire that particular parcel. And, contrariwise, if SCD determines that a parcel is required to construct and operate the Landfill, this may or may not result in the Township's need to acquire the property by condemnation. However, this is clearly not a situation like *110 Washington Street*, where the power to condemn was contractually reallocated to a private party to act in place of the entity clothed with the power of eminent domain. For these reasons, we reject Condemnees' claim that the trial court erred by failing to find that the Township unconstitutionally delegated its eminent domain powers to the private landfill developers.

18

*2. Whether the Trial Court Erred By Failing to Find that the Private Landfill Developer SCD Was the Primary and Paramount Beneficiary of the Township's Exercise of Eminent Domain*

Next, Condemnees argue that the trial court erred by failing to find that SCD, not the public, is the "primary and paramount beneficiary" of the Township's exercise of eminent domain. *See In re Bruce*, 266 A.2d 96, 99 (Pa. 1970) ("a taking will be seen as having a public purpose only where the public is to be the primary and paramount beneficiary of its exercise"). Condemnees assert that the trial court found that SCD would receive greater net income from the Landfill than the Township, while the Township is burdened with the risk and liabilities, such as DEP penalties, threat of catastrophic events, landfill closure costs and continued leachate treatment. Condemnees argue that, given these findings, the trial court was constrained to conclude that SCD will be the principal and primary beneficiary of the taking, while the benefit to the public is only incidental. Condemnees also allege that the taking was invalid under Pennsylvania's Property Rights Protection Act (PRPA),[5] because it was being accomplished for the benefit of private enterprise, i.e., the landfill developers. *See, e.g.,* 26 Pa.C.S. §204(a) (generally prohibiting the use of eminent-domain powers to take private property "to use it for private enterprise").

In response, the Township argues that comparing the Township's projected revenues from the Landfill with SCD's is not the proper focus of the private/public use analysis. Instead, the Township argues that the focus must be on the purpose of the taking, itself. The Township argues that the evidence on that issue was undisputed. The Township points out that its landfill engineer testified that the purpose of the taking was to fill the portion of the Eastern Pit on Condemnees' property and

---

[5] PRPA added Chapter 2, "Limitations on Use of Eminent Domain," to the Eminent Domain Code. 26 Pa.C.S. §§101-116.

19

that filling the Eastern Pit will provide structural support for the Landfill's liner system, eliminate a dangerous 50-foot wall condition, reduce the flow of stormwater into the deep mines beneath the Landfill, and diminish acid mine drainage. Filling the Eastern Pit will also enable the DEP to restore the Little Wolf Creek by directing the flow of stormwater and overflow from a nearby pond around the Landfill to a channel that the DEP would improve. It also prevents the local public from using the Eastern Pit as a dump. And, it will save the Township and its taxpayers from having to spend over $1 million dollars to build a dangerously steep MSE wall to provide structural support for the Landfill. The trial court credited that testimony and found that filling the entire Eastern Pit would benefit the public.

Relying on *Belovsky*, the Township further argues that a taking does not lose its public character merely because there may exist in the operation some feature of private gain, for if the public good is enhanced it is immaterial that a private interest may also be benefitted. In the Township's view, the prospect that it may not, in the end, net as much as the landfill developers, should not detract from the undeniable public "landfill purpose" of the taking.

A municipality may only exercise eminent domain power to condemn property for public use. PA. CONST. art. I, §10 ("[N]or shall private property be taken or applied to public use, without authority of law and without just compensation being first made or secured."). Our Supreme Court equates "public use" with "public purpose." *Middletown Township v. Lands of Stone*, 939 A.2d 331, 337 (Pa. 2007). A proper public purpose exists only where the public is the primary and paramount beneficiary of the taking. *Id.* Additionally, the Eminent Domain Code, as amended by the PRPA, expressly prohibits, subject to several exceptions, the taking of one's private property for the private enterprise of another. 26 Pa.C.S. §204(a) ("[T]he exercise by

20

any condemnor of the power of eminent domain to take private property in order to use it for private enterprise is prohibited.").

The question of what constitutes a public use is "highly fact-dependent." *Reading Area Water Authority v. Schuylkill River Greenway Association*, 100 A.3d 572, 580 (Pa. 2014) (citation omitted). *See also Dornan v. Philadelphia Housing Authority*, 200 A. 834, 840 (Pa. 1938) (opining that "judicial interpretation of 'public use' has not been circumscribed in our State by mere legalistic formulas or philological standards," but "has been left, as indeed it must be, to the varying circumstances and situations which arise, with special reference to the social and economic background of the period in which the particular problem presents itself for consideration").

An objector has a heavy burden to show a taking is for a private use and not a public benefit, as there is a strong presumption that the condemnor has acted properly. *In re Condemnation of Property of Waite*, 641 A.2d 25 (Pa. Cmwlth. 1994). For a taking to be considered as effectuating a public purpose, the citizenry at large, rather than a private entity or individual, must be the principal recipient of any benefit. *In re Forrester*, 836 A.2d 102, 105 (Pa. 2003). Moreover, a "taking does not lose its public character merely because there may exist in the operation some feature of private gain, for if the public good is enhanced it is immaterial that a private interest also may be benefitted." *Appeal of Washington Park, Inc.*, 229 A.2d 1, 3 (Pa. 1967) (quotation omitted). *See also In re Forrester*, 836 A.2d at 105 (finding that a public purpose was the predominant reason for the taking although there was private gain to the developer incident to the taking); *cf. Lands of Stone*, 939 A.2d at 338 ("To condemn the land so that Mr. Stone could commercially farm it, thereby reaping a profit from land owned and maintained by the township, serves a purely private, and thus, unconstitutional interest."). As our Supreme Court observed, "[i]t can reasonably be argued, then, that

21

whether the taking presently in issue is 'primarily' for a public use or a private benefit is a matter of perspective." *Reading Area Water Authority*, 100 A.3d at 582.

In *In re Condemnation of .036 Acres, More or Less, of Land Owed by Wexford Plaza Association*, 674 A.2d 1204 (Pa. Cmwlth. 1996), the Township of Pine filed a declaration of taking of a portion of William and Gita Bauerle's (the "Bauerles") land to open and construct a new public road to connect Booker Drive to the Wexford Plaza Shopping Center, a strip mall owned by a private developer, Wexford Plaza Associates. The Bauerles filed preliminary objections to the declaration of taking arguing, among other things, that the taking was for the private purposes of Wexford Plaza Associates. *Id.* at 1207. At the hearing, the Township presented credible evidence that the proposed road would be available to the public, would benefit a number of other properties in the area beyond the Wexford Plaza Shopping Center, and would enhance public safety. *Id.* at 1209. We held that it was immaterial that a private interest may also benefit.

In *Seligsohn v. Philadelphia Parking Authority*, 194 A.2d 606 (Pa. 1963), our Supreme Court found that the condemnation of certain land in the City of Philadelphia by the Philadelphia Parking Authority, for the purpose of construction and operation of a public parking garage, had a public use, even though the operation of the garage itself was leased to two private corporations, which stood to benefit business-wise. Title to the property was to remain in the Authority and, ultimately, vest in the City of Philadelphia. In that instance, our Supreme Court held that there was a sufficient and adequate public purpose shown to find the exercise of eminent domain lawful. The mere fact of some private gain to the two leasing corporations did not render the exercise of the power of eminent domain unlawful.

Here, as in *Condemnation of .036 Acres* and *Seligsohn*, the record does not support Condemnees' claim that the condemnation was primarily for private purposes. The trial court found that the primary objective of the condemnation was to obtain land to provide support for the Landfill's liner system and save the Township and its taxpayers from having to spend over $1 million to build a dangerously steep MSE wall to provide structural support for the Landfill. Being able to fill the entire Eastern Pit will reduce the flow of stormwater into the deep mines beneath the Landfill and diminish the creation of acid mine drainage. Filling the entire Eastern Pit will also enable DEP to restore the historic Little Wolf Creek by directing the flow of stormwater and overflow from a nearby pond around the Landfill to a channel that the DEP would improve. The Landfill will be used by the public in general, as it will be available to the residents of neighboring municipalities. The record supports these findings.

Furthermore, with regard to the statutory prohibition against a taking "to use it for private enterprise," 26 Pa.C.S. §204(a), there was no evidence to suggest that the Township condemned the property simply so it can transfer ownership to the landfill developers to use as a private enterprise. Here, the Township condemned the portion of the Eastern Pit so that it could, itself, undertake to construct and own and maintain a construction/demolition waste landfill. The Township did not seek to condemn Condemnees' property so that it could provide it to the landfill developers. This is not a situation like *Reading*, 100 A.3d at 580, where the Reading Area Water Authority ("RAWA") condemned a drainage easement so that it could provide the utility easement to a developer to accommodate the developer's drainage facilities. In that case, it was significant that RAWA condemned the property to allow a developer to occupy it and use it for private enterprise –namely, to develop a residential subdivision. *Id.*

23

Here, the Township will own the land and the Landfill and, although the private landfill developers might potentially benefit more financially than the Township in the long run, the public will still benefit immensely because the taking of a portion of the Eastern Pit on Condemnees' property will provide support for the Landfill's liner, save the Township and its taxpayers' money, enable the restoration of Little Wolf Creek, prevent acid mine drainage, and provide a needed landfill for neighboring municipalities. Also, over the life of the Landfill, the Township will receive $47 million that it can use for its fire department, police department, roads, senior citizens, etc. Lastly, we note that the Solid Waste Management Act[6] provides that one of its purposes is to utilize, wherever feasible, the capabilities of private enterprise in accomplishing the desired objectives of an effective, comprehensive solid waste management program. So, it is contemplated that a township will utilize private landfill developers to help with the construction and operation of a landfill, and pay them for their services. Based on the evidence credited by the trial court, we cannot conclude that the Landfill primarily serves the interests of the private landfill developers or that any benefits to the public are merely tenuous or incidental.

Accordingly, for these reasons, we reject Condemnees' claim that the trial court erred by failing to find that the taking was not for a public purpose.

*3. Whether Condemnees' Preliminary Objections Encompassed a Challenge to the Township's Use of its Eminent Domain Powers under 53 P.S. §67104 to Generate Revenues for the Township*

---

[6] *See* Section 102 of the Solid Waste Management Act, Act of July 7, 1980, P.L. 308, *as amended*, 35 P.S. §6018.102 ("it is the purpose of this act to … utilize, wherever feasible, the capabilities of private enterprise in accomplishing the desired objectives of an effective, comprehensive solid waste management program.").

As noted, there was testimony by the Township officials that the impetus behind the decision to construct the Landfill was, in effect, to generate revenue for the Township. The trial court, *sua sponte*, postulated in footnote 3 that when the legislature allowed the use of such eminent domain powers for landfill purposes, it may not have envisioned a township utilizing eminent domain for the primary purpose of engaging in the profitable enterprise with a private entity. The trial court did not address the issue further because it found Condemnees did not raise this precise issue in their POs. In Condemnees' view, their PO which addressed the public purpose of the taking addressed the comments contained in the trial court's footnote. They also maintain that they could not have raised the issue in these proceedings, as preliminary objections to a condemnor's "power and right" to condemn "are limited to challenging the condemning authority's grant of power from the legislature through appropriate enabling statutes." *In Re Condemnation of Real Estate by the Borough of Ashland (Appeal of Kenenitz)*, 851 A.2d 992, 996 (Pa. Cmwlth. 2004). They reason "[i]f Condemnees wish to challenge [the Township's] actions relative to the Second Class Township Code, 53 P.S. § 67104, and its ability to use its right to operate a landfill for purely private gain, they would have to do so … under a declaratory judgment action challenging the legality of the contracts themselves regardless of whether eminent domain is exercised." (Condemnees' Brief, at 22.) The validity of Condemnees' reasoning aside, it is clear that Condemnees are not currently attempting to raise the issue broached by the trial court. Because the issue is not before us, we need not address it further.

In summary, we conclude that all of the findings of the trial court below are based upon substantial evidence and, therefore, the trial court did not abuse its discretion. The record more than adequately supports the trial court's conclusion that

25

the Landfill is predominately and primarily a public use, and the potential for private gain by the landfill developers if the Landfill is successful is merely incidental. We, therefore, affirm.


_____
PATRICIA A. McCULLOUGH, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | |
|---|---|
| In Re: Condemnation by the Township of Blythe of a Portion of the Property Owned by Julia Fatula, Anna Sciuchetti, Charles Bucklar, Jr., and John Bucklar, and the Unknown Heirs and Assigns of John Bucklar, Sr., and the Unknown Heirs and Assigns of Charles Bucklar, Sr., and Unknown Persons and Interested Parties, Located in Blythe Township, Schuylkill County, Schuylkill UPI 02-06-0006 | : : : : : No. 1244 C.D. 2018 : : : : : : : |
| Appeal of: Julia Fatula, Anna Sciuchetti, Charles Bucklar Jr. and John Bucklar | : : |

## *ORDER*

AND NOW, this 12th day of February, 2020, the Order of the Court of Common Pleas of Schuylkill County dated August 10, 2018, is hereby affirmed.

_____
PATRICIA A. McCULLOUGH, Judge